Lawrence Schaffer, Plaintiff-Appellant, v. Everett R. Veach, Defendant-Appellee.

Gen. No. 10,520.

Fourth District.

July 20, 1965.

Rehearing denied August 16, 1965.

Philip C. Zimmerly, of Champaign, for appellant.

Phillips, Phebus & Tummelson, Barth & Follmer, of Urbana (Darius E. Phebus and Hurshal C. Tummelson, of counsel), for appellee.

TRAPP, J.

In an action framed under the Structural Work Act, Chap 48, sec 60–69 (Ill Rev Stats 1959), the jury found in favor of the defendant. Plaintiff appeals from the judgment entered on such verdict.

The complaint alleges that the plaintiff was employed by Traylor Bros., Inc., a corporation, which was the general contractor in the construction of a building for S. S. Kresge Co., a lessee. The defendant was a subcontractor for masonry work upon such building. It appears that this contract was one of a number of contracts, each relating to the construction of a building or unit which was part of a development known as Country Fair Shopping Center, Champaign, Illinois, and the work upon all of the units in such

complex was being done by the contractor and the several subcontractors simultaneously.

The complaint alleges that the defendant, "was a supplier of scaffolding for Traylor Bros., Inc." It was alleged, among other things, that it was then and there the duty of the defendant to maintain the scaffolding supports and mechanical contrivances for use in the ·erection of the building and to construct the scaffolding and the planking thereon in such manner that the planking and the scaffolding would support an adequate load. It was further alleged that the defendant "wilfully failed" to take the precautions required by law and permitted dangerous planking to remain on the scaffolding, when by the exercise of reasonable care such dangerous condition could be discovered, and that as the direct and proximate result, the plaintiff fell when the planking on which he was standing on the scaffold broke so that he suffered permanent injury. Issues were formed for the jury by defendant's answer.

In argument it was also urged that by custom in the building trades, members of the various building crafts used scaffolding that had been erected by members of other crafts upon the job. Evidence upon this theory was permitted to go to the jury and was presumably considered by the jury in arriving at its verdict of not guilty.

The tenor of the evidence is that the scaffold referred to was constructed from tubular units, sometimes referred to as "bucks." Such units could be joined together to construct a framework as required. Planks were then laid upon or across the bucks. No fault or defect in the "bucks" is in evidence and none is claimed. The issue is as to whether or not defendant is liable for planks alleged to be defective.

Upon the issue of defendant's contractual duty to provide scaffolding for the erection of the building,

the defendant testified that he had a separate subcontract for each unit being constructed in the Country Fair Shopping Center, and that Traylor Bros., Inc., was the general contractor. The contract for the Kresge unit, Exhibit 102, has been placed in evidence. Defendant testified that he had scaffolding for his own use on the job, as his contract stipulated, and that the contractor and the several subcontractors had scaffolds on the job. Plaintiff does not contend in his brief and argument that the exhibit provided that the defendant should supply all of the scaffold for the erection of the Kresge building.

Hillenbrand, the general superintendent for the contractor, testified in behalf of the defendant. He stated that the contractors had their own scaffold on the job, there being at least 20 sections of it, and that such scaffold was used by the ironworkers. He further testified that there was generally enough scaffold on hand, apparently referring to scaffold supplied by the contractor, and he further testified that the contractor generally had each craft furnish its own scaffolding. His testimony was to the effect that the contractor, Traylor Bros., Inc., had boards available to use as planking upon the scaffold provided by the contractor and that ironworkers, sheet metal workers, carpenters, cement finishers and air conditioning men all used such scaffold on the job.

Plaintiff's testimony as to defendant's obligations to supply scaffold is to the effect that he never saw Traylor Bros.' scaffold at the site, and that his employer, Traylor Bros., would have told him, the plaintiff, if the former had had scaffold on the job. McVey, a carpenter foreman for the contractor, called by the plaintiff, testified that he did not know whether Traylor Bros., the contractor, had scaffold on the job.

Gurney Brown, an ironworker called by the plaintiff, was working with the plaintiff at the time of his

171

injury. He testified that he did not know whether Traylor Bros. had scaffolding planks on the job. Upon cross-examination, the Abstract shows that he testified that, "We erected our own scaffold part of the time and part of the time we did not." He continued that he did not know whether plaintiff and he erected the scaffold on which they were working that day. As shown in the Abstract, he also stated on cross-examination:

> "I had an idea that we built our own scaffold, made up a scaffold, might be we do that and we move it from one store front to another. I don't know whether we moved it or not."

Plaintiff offered evidence with regard to the custom of the building trades as to one craft using the scaffolding erected by another craft. The plaintiff, an ironworker foreman for the contractor, does not testify upon the points.

One Sollers, a mason, called by the plaintiff, stated that it was "pretty common" for crafts to use a scaffold, "If it is already erected in place where they have a little work to do." The Abstract shows that upon cross-examination he testified:

> "As a rule if a masonry scaffold is already erected and there is other work to be done, then they use it as far as I know, regardless whether it is a small or large amount of work to be done, masons might use other scaffold."

McVey, carpenter foreman for Traylor Bros., testifying as to the custom, said:

> "There is a difference from masonry scaffold than from other forms of scaffold. They are usually built differently, we will use what is erected."

172

Brown, an ironworker, testifying for the plaintiff, on cross-examination stated that normally ironworkers build their own scaffold. He further testified that on the date of the injury, the masons were not doing any work on the Kresge unit, and that masons would have no occasion to put up scaffold in the area until they put up their brick.

Ritchie, a hod carrier, testifying at the call of the defendant, stated that if the masons had scaffold built it is possible that other crafts would use it. The defendant, testifying in his own behalf, stated that other crafts can use scaffold already in place and that they did not build a scaffold when one is already up.

This evidence seems to be consistent and in accord with the determination of the court in Fetterman v. Production Steel Co. of Illinois, 4 Ill App2d 403, at page 410, 124 NE2d 637, that there exists in the building industry a custom that workers of one trade or craft may use the scaffold of another trade or craft when such scaffold is erected in place and convenient for the work to be done.

Absent of finding of a jury upon the evidence in this case, we cannot say that the custom of the industry imposed a greater obligation upon this defendant than that found to exist in the Fetterman case.

Hillenbrand, general superintendent for the contractor, testified that at the date in question the defendant's masons had been working at the Goldblatt unit several buildings removed from the Kresge unit. He further testified that on the date of the accident he did not believe that the masons were working as it was his recollection that it was too cold to lay brick.

The sequence of events leading up to the injury are discovered primarily through the testimony of the plaintiff. He testified that when he wanted scaffold

for the work he was to do, he "contacted" the laborers of the contractor, Traylor Bros., and he speaks of 5 men and a foreman, employees of Traylor Bros. as doing the work. Defendant testified that he had seen the metal parts of the scaffold put together in the breezeway between the "Drug store and the Jewelry store." Who put it together is not apparent in the Abstract and where the breezeway is with relation to the Goldblatt and Kresge units we cannot tell. From such Abstract we must infer plaintiff's testimony to be that the scaffold bucks or tabular units were moved from the breezeway to the Kresge unit. He testified further:

"Before it was moved the mason was on only one scaffold. There was a small job. The mason did not have any boards. This is a four section scaffold. One section was on top of the other, there were two of those. I don't remember whether they took the boards off and moved it."

By his testimony, the plaintiff was present when the laborers brought the planks, could see what planks were brought but had no occasion to make any inspection of the planks. He and the ironworker, Gurney Brown, had welded 15 to 20 channel irons that day, and as work was done, the laborers of Traylor would move the sections. Brown, the ironworker, working with the plaintiff, testified that he doesn't know if the Traylor employees moved the scaffold or "whether we moved it." McVey, a carpenter, testifying for the plaintiff said he saw the scaffold moved from the Eisner unit. From the Abstract we cannot ascertain its location with reference to the Goldblatt unit or the Kresge unit.

It is also plaintiff's testimony that when the scaffold was moved, it was not planked and that they went to the Veach pile; that there was only one place

174

to store plank at that time and that they would have to take the plank out of Veach's pile.

Plaintiff's post-trial motion urges that the verdict is contrary to the manifest weight of the evidence in that the uncontradicted evidence is that the plank was owned and furnished by the defendant. Plaintiff's Instruction #6 was refused by the court. It is in the language:

"If you find that the defendant was the owner of those portions of the scaffold which caused injury to the plaintiff, then a wilful violation may be found to exist if the conditions were in fact known to the defendant or if by the exercise of reasonable care the existence of such conditions which caused injury to occur could have been discovered and become known to the defendant."

Plaintiff's Instruction #6A was given by the court and is in the following language:

"If you find that the defendant furnished the scaffold which caused injury to the plaintiff, then a wilful violation may be found to exist if the conditions were in fact known to the defendant or if by the exercise of reasonable care the existence of such conditions which caused injury to occur could have been discovered and become known to the defendant."

Plaintiff urges that the refused Instruction #6 was proper under the authority of the Supreme Court in Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785. This opinion is well-known and we do not believe that it need be summarized. It makes the test of the liability of the owner of the premises, under the Act, depend upon whether or not such owner is, in fact, in charge of the work operation wherein the scaffold is used. The court said, at p 321:

175

> "Wilful violations means knowing violations, and in the nature of things they can be perpetrated only by persons directly connected with the operations, and not by virtue of mere ownership of the premises."

Referring to the contention that the Act incorporated the concept of nondelegable duties in its language, the court said, at p 320:

> "Moreover, to construe the statute as plaintiff suggests would mean that every subcontractor or foreman on the job, irrespective of his assignment, would have a duty to see that every other subcontractor or foreman complied with the provisions of the Scaffold Act or otherwise sustain liability under the act. The implausibility of that construction is self-evident."

Upon this question plaintiff also cites Yankey v. Oscar Bohlin & Son, Inc., 37 Ill App2d 457, 186 NE2d 57. Under the facts of that case it does not appear to be authority for such position for there the defendant subcontractor agreed that his power shovel used in excavating should be converted and used as a hoist for the benefit of the other subcontractors. The employees of such defendant converted or adjusted the machine by installing a form of boom and the employees of the defendant were, in fact, operating the hoist at the time of the injury. The court held that under the circumstances both the contractor in charge of the project and the subcontractor supplying the hoist, were in charge of the work for purposes of liability.

Again, in Kobus v. The Formfit Co., 56 Ill App2d 449, 206 NE2d 477, decided in the First District, Appellate Court, in March 1965, the court said in a case involving the owner of the premises as the defendant:

"Keeping in mind that the Gannon decision abrogated the liability-without-fault concept existing prior thereto, whether an owner or other person enumerated in section 9 is to be held responsible for erecting scaffolding in a "safe, suitable and proper manner" depends upon whether he had charge of the work involving the violation, and the fact that the owner knew that scaffolds would be used on the project does not obligate him to see that they are constructed in a safe manner."

The significance of the rule is demonstrated in this case by the testimony of the defendant and of one Ritchie, the hod carrier, who erected the scaffold for the work done by the masons. Each testified that when planks were placed upon the bucks they were inspected to determine whether such planks were broken, defective or otherwise unfit for use.

Sollers, a mason employed by the defendant, testified that he did not see any plank of the defendant break "while it was being used properly."

■ From the authorities cited by plaintiff and considered herein, we can see no basis for applying a different rule to the defendant as subcontractor who may have been the owner of planks used, than is applied to the owner of premises in the cited cases. The concept of being in charge of the work is applicable in both cases.

The plaintiff also contends that the court erred in giving defendant's Instruction #10 in the language of the Act and in refusing to give plaintiff's Instructions #5 and #5A. The latter instructions are substantially identical and may be considered together. They quote from the statute and are followed by the paragraph:

"You are further instructed that the word 'erected' used in such statute means 'to furnish'."

It is urged that the giving of defendant's Instruction #10 and the refusal of plaintiff's Instructions #5 and #5A is error in that it fails to include the modification of the meaning of the word "erected" arising from judicial interpretation of the statute.

In support of the position that the statutory term "erected" includes the connotation of "furnish," he cites Bounougias v. Republic Steel Corp., 277 Fed Rep2d 726, and Fetterman v. Production Steel Co. of Illinois, 4 Ill App2d 403, 124 NE2d 637.

In Bounougias, the owner of the premises contracted for painting of its plant. In order to paint the upper windows and structure of the building, the paint contractor's foreman arranged for the use of defendant's crane. The crane moved on tracks hung from the girders of the building. The defendant's employees placed the crane in position at the request of the contractor's foreman and turned off the switches or controls. The workmen then mounted the crane and stood upon various parts of it to paint the upper structure of the building. The contractor's foreman was in the cabin of the crane and in moving about activated the controls of the crane so that it moved and the plaintiff was thrown from the crane as he was working. Defendant owner contended that the crane was not a scaffold within the language of the Act. The court found from the evidence that the crane had been used as a scaffold on other occasions when necessary to maintain the upper parts of the building, and that while its primary purpose was to move material within the building, there was a secondary purpose of use as a scaffold. The court said, at page 731:

> "The crane had been literally 'erected or constructed' and used for the repairing and painting of Republic's building. It was positioned temporarily just as any scaffold would be constructed

178

or positioned temporarily to accomplish its purpose. The Act when liberally construed uses the words 'erected and constructed' in the sense of being furnished. It was furnished and intended to be used, at the time plaintiff was injured as a scaffold."

This opinion cites as authority that the word "furnish" is included in the words "erected and constructed," Schultz v. Henry Ericsson Co., 264 Ill 156, 106 NE 236. The precise authority of this opinion upon the question is dubious as the question in the Schultz case concerned the sufficiency of a statement of claim in an action of the 4th class in the Municipal Court of Chicago. The Municipal Court Act, at that time, provided that in cases of the 4th class:

"Issues shall be determined without other forms of written pleading than those expressly prescribed and provided for. . . ."

and in tort actions the claim shall consist of:

" '. . . a brief statement of the nature of the tort and such further information as will reasonably inform the defendant of the nature of the case. . . . , but nothing herein contained shall be construed to require the statement of claim in any action for a tort to set forth the cause of action with the particularity required in a declaration at common law.' "

The claim filed in the Schultz case alleged that the defendant had failed to furnish a safe and sufficient scaffold upon which to work. The Supreme Court, in holding that the statement was sufficient to reasonably inform the defendant, said, among other things:

"The charge is almost in the language of the statute, with the provisions of which the appellant is charged with knowledge as a matter of law."

In Fetterman, cited to support his contention, we have been unable to find specific language concerning the construction of the word "erect" to include "furnish." From the facts of that case, we find that a masonry subcontractor had erected a scaffold in use by his men. Some alteration was required to be performed by ironworkers. The masons left the scaffold upon which they had been working and the ironworkers proceeded with their job, using the scaffold. Plaintiff was injured when he climbed the outside of the scaffold and fell when an inadequately secured rail collapsed. The court permitted evidence that the members of one trade commonly used the scaffold of another trade when the scaffold was in place where they had work to do. Under the holding upon the facts in this case, in a certain sense of the word, the subcontractor did "furnish" the scaffold which he had, in fact, erected and constructed in that place for use as a scaffold and it was so being used.

We cannot conclude upon this authority that the ownership of planks piled somewhere in the general area of the work is the equivalent of a scaffold erected in place for use as a scaffold, and under the facts of this case we do not feel that the cited authorities control.

We therefore conclude that the giving of defendant's Instruction #10 and the refusal of plaintiff's Instructions cannot be said to be error under the facts of this case.

Plaintiff speaks of being prejudiced by certain actions of the trial court before the jury. Briefly, when objection was made to the calling of certain of plaintiff's witnesses upon the ground that they had not been named in a discovery deposition, the court permitted plaintiff to interview the witnesses tendered. Upon one occasion, counsel left the courtroom with the

180

witness for purposes of interview while the court and the jury waited. Upon another occasion, the trial was recessed and the jury left the courtroom while the interview was being conducted. As to the conduct of the court being prejudicial to the plaintiff and plaintiff's counsel, we cannot say that the conduct was in any way disparaging to the plaintiff's case, and we do not consider it to be any indication of opinion or other bias of the court.

Again, we cannot say that the actions of the trial court were other than that of the exercise of its discretion under this situation. It is claimed that there was no sufficient preliminary background established for the court to act in such fashion. Hansel v. Friemann, 38 Ill App2d 259, 187 NE2d 97 and Wright v. Royse, 43 Ill App2d 267, 193 NE2d 340, cited by plaintiff in support of plaintiff's contention are more properly directed to the question of whether or not under comparable circumstances the testimony of the witnesses should be excluded. It seems apparent that the court employed this method as a simple step to determine whether or not more particular determinations were required. We cannot hold that there was such an abuse of discretion as to constitute reversible error.

█ Plaintiff further complains of prejudice arising from the fact that during the instruction conference he had urged the trial court to instruct defendant's counsel as to the manner in which he should argue the term, "wilful violation" under the statute. To this the court stated that he would sustain objection to argument that was out of place. Certain portions of the argument made by defendant are claimed to have been improper, but there is no objection discovered from the Abstract and no objection appears, in fact, to have been made. We do not believe that the record

181

shows that the trial court had adopted such theory of the case that it would have been useless for plaintiff to make his objection under plaintiff's cited authority, Burger v. Van Severen, 39 Ill App2d 205, 188 NE2d 373.

In view of the conclusions of this opinion that the evidence does not sustain the allegations of the complaint, and without determining whether there was any impropriety or error in the matter, we do not believe that the argument constitutes reversible error under the authority of City of Chicago v. Pridmore, 12 Ill2d 447, 147 NE2d 54.

■ We must conclude that the verdict of the jury is not contrary to the manifest weight of the evidence and that there is not reversible error as a matter of law in the giving and refusing of instructions or in the manner of conducting the trial.

The judgment of the trial court is, therefore, affirmed.

Affirmed.

SMITH, P. J. and CRAVEN, J., concur.