108

RAY CARRUTHERS, Plaintiff-Appellant, *v.* B. C. CHRISTOPHER & COMPANY *et al.,* Defendants-Appellees.

(No. 71-335;

Fifth District—July 20, 1973.

EBERSPACHER, P. J., dissenting.

Hanagan, Dousman & Giamanco, of Mt. Vernon, and Burnside, Dees and Johnston, of Vandalia, for appellant.

John E. Jacobsen and Terry Black, both of Craig & Craig, of Mt. Vernon, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiff appeals from a judgment of the Circuit Court of Fayette County granting defendants' motion for summary judgment in a suit brought by plaintiff pursuant to the Illinois Structural Work Act (Ill. Rev. Stat., ch. 48, par. 60—69).

Plaintiff's complaint alleged that the defendants B. C. Christopher & Company and John Shanks, as its resident manager, were in charge and control of certain structures known as grain elevator and grain bins and in charge of certain alterations and repairs thereon when plaintiff was injured while working on an unsafe support or other mechanical contrivance furnished by the defendant in the performance of the work.

Plaintiff Carruthers was an employee of Okaw Valley Construction Company, hereinafter Okaw Valley. Defendant B. C. Christopher & Company, hereinafter Christopher Company, ran a grain elevator business at Vandalia, Illinois and at other locations, with defendant John Shanks as its managing agent at Vandalia. Manager Shanks determined that several cylindrical grain chutes, commonly called "spouts" or "spouting", were worn at the bottom and leaking grain. Testimony by Shanks indicates that the practice of Christopher Company and the bin business was to turn these spouts approximately 180 degrees every two or three years, prolonging the use of the spouting and preventing grain from falling or leaking out of the worn spouts. He estimated that a 30-foot length of spout would weigh 300 or 400 pounds, and testified that turning the spouts was a two-man operation.

The turning process required the two men to work at or near the tops of the elevator or bin structures. The spouting runs from the elevator down to the various bins. At the top of the elevator, the spout is attached

to a structure called a "leg". There is a railing approximately three feet high at the top of the leg where the worker must stand to turn the spout. Compton was working at the high end of the spout, standing at the leg with the protective railing. The bottom end of the spout, where plaintiff Carruthers was working, is attached to the top of the bins at their caps. The spout is fastened to the cap, and the cap in turn is screwed or locked to the bin. In order to turn the spout, it is necessary to unfasten the cap. The cap is about three feet in diameter. There is no guard or railing around the cap, although the worker must stand there in order to turn the spout. Nothing in the briefs or abstracts indicated why there was no railing on the caps, or whether workers stood on the caps for any purpose other than turning the spouts, nor does the record indicate why railing is put on the leg, or for what other purposes workers would stand on the leg. Plaintiff was standing on the cap which was unscrewed or unfastened from the bin, and which had no railing. From this position, plaintiff fell approximately 37 feet to the ground, sustaining injuries.

Defendants made a motion for summary judgment (with attached discovery depositions and an affidavit) for the reasons, *inter alia*:

"2. The defendants were not the owners of the premises where plaintiff fell; defendant B. C. Christopher and Company was lessee of the premises and John Shanks was its employee.

3. Neither B. C. Christopher and Company nor its employee John Shanks nor any other employee exercised any supervision over the work being done at the time of the occurrence, gave no directions concerning the manner of doing the work, furnished no equipment in connection with the performance of the work but simply contracted with Okaw Valley Construction Company for it to perform the work of turning the elevator spouts. The plaintiff and one Kenneth Compton were employees of Okaw Valley Construction Company and said employees and their employer furnished equipment used in performing said work.

4. Okaw Valley Construction Company and its foreman Kenneth Compton were the persons in charge of the work and they are the persons who directed the work, supervised the work and performed the work.

Plaintiff Carruthers testified on his deposition that he was a construction laborer working for the Okaw Valley Construction Company on April 29, 1969. He reported for work that morning and was sent over to the B. C. Christopher elevator to help Kenny Compton turn some spouts. He went there in his car and Compton went in his truck. Some of the tools were furnished by him, some by Compton and some by

Okaw. When they got to the Christopher Company they both went into the office where they saw Christopher's manager, Johnnie Shanks, who asked them if they were there to fix the spouts. Kenny then said, "Well, we just as well get at it," and they both went outside. He further testified that neither Shanks nor anyone from Christopher gave them any directions on how to do the work. When asked if there was any kind of scaffolding that might have prevented his accident, he stated:

"Yes, sir. In this picture and on the bins at Brownstown you notice that there is an angle iron brace on this with a cradle above the first flange—same way on this one. This supports the extra weight in case the bolts shear off. And I would say if this bin would have had this angle iron brace here that this bolt would not have sheared off and this bolt would not have, and it wouldn't have had enough weight to pull this boot out of the bin."

Compton testified that he worked for Okaw Valley as a carpenter on the day of the accident and that LeRoy Taylor, who ran that company, sent him and Carruthers to Christopher's to turn some spouts on that day. He took some of Okaw's equipment along and some of his own. Nobody told him or Carruthers how to do the work. When asked if there could have been a scaffolding furnished for the place where plaintiff was working, he stated:

"There could have been a scaffolding built but it would have been an expensive and quite lengthy process to have built it. Which, as I see now, would have been the best deal, maybe, to have done."

With reference to his conversation with Shanks concerning the agreement to do the work, his testimony was as follows:

"Q. Tell me when the conversation first started about turning the spouts. Tell me the time before April 29, 1969, the conversation was held.

A. Well, he wanted to know if I could do it and I said that I could.

Q. What did he ask you, Kenny, what did he ask you—generally, the words.

A. Oh, I would say that he asked me if I wanted to or if I would, probably, turn those spouts. We had talked over several different things that needed to be done.

Q. Was he going to engage you as an individual or on behalf of Okaw Valley?

A. Well, it started out he was going to engage me as an individual. And then, I don't remember whether I said at that time I

would rather do it under Okaw Valley or whether I talked to LeRoy first. But I know that LeRoy—we discussed that we better do it under Okaw Valley Construction.

Q. And did John realize this would be a two man job—that you wouldn't do it yourself?

A. Oh, yes, I think so.

Q. Did you separate in the bill—or did LeRoy—so much for what would, labor, material and so much for turning spouts, or would it be lumped together?

A. I expect, as far as me turning in anything to LeRoy, I just turned in time and material used. And—I don't know. I expect it was stated on the invoice how much time there was in turning the spouts and replacing the spout here.

Q. You stated that two spouts you turned and some additional spouts you repaired?

A. Yes. And unloading out of the main elevator leg—out of the main leg below the bins, the unloading legs out of the bins, there to the pit, we had to replace about a twelve inch pipe underneath that had rusted out.

Q. You mentioned instead of turning all the spouts you repaired some, is that correct?

Mr. Jacobson: Just a minute. I think his testimony is clear. He said he replaced a twelve inch pipe underneath. He has never said he repaired any spouts that led from the elevator leg to bins.

Mr. Dousman: He testified he did not complete the turning of all the spouts, the job was halted and he repaired remaining spouts—.

Deponent: That wasn't clarified. I did all this other repair work on my own. As far as Okaw Valley—I'll clarify that for you. As far as Okaw Valley is concerned, we replaced the pipe that fell and we repaired the main pipe underneath the bins there down in the pit. And after that at different intervals Johnnie would call me, and I repaired the pipe on my own. This is on my own time."

Shanks testified that he was employed as local manager for B. C. Christopher Company on April 29, 1969. With reference to the agreement of April 29, 1969, he stated:

"Okay. Kenny Compton came in—I can't give you the dates, but Compton came in and he was talking—he does business with me, Kenny does. He came in, I would say, two or three days before and was talking about they didn't have much to do; he thought he was going to get laid off. I says, 'okay, when you guys get a little time I've got spouting to turn here.' And I told him

I had spouting to turn and when they had a few days they could come and start turning spouting."

Compton was in buying feed from Christopher at the time he first talked to Compton about the work. He stated that Compton owed him money and he first thought that Compton could go ahead and work directly for him, but a day or two later Compton came back in and said that Taylor wanted him to work for Okaw Valley because of union dues, insurance, etc. He testified that he never agreed on a price with Compton or Okaw Valley. Okaw just sent him a bill and he paid it.

Section 69 of the Structural Work Act places liability for violation of the Act upon "any owner, contractor, subcontractor, foreman or other person having charge of the erection, construction, repairing, alteration * * * of any building, bridge, viaduct or other structure within the provisions of this Act * * *."

■■ Violations of the Act can only be committed by persons directly connected with the operation and not by virtue of mere ownership of the premises. (*Gannon v. C., M., St. P. & P. Ry. Co.*, 22 Ill.2d 305.) However, neither the exercise of supervision and control nor the retention of the right to do so are essential ingredients for having charge. (*Larson v. Commonwealth Edison*, 33 Ill.2d 316.) Direct connections with the operations over and above mere ownership is necessary for an owner to be liable under the Act and the question whether the particular connections and activities in a given case are such that an owner may be deemed to be in charge is a question of fact for a jury to decide. (*Gannon* and *Larson.*) Whether or not a person is in charge of work has been described as the "ultimate factual question" in cases arising under the Structural Work Act. (*Isabelli v. Cowles Chemical Co.*, 7 Ill.App.3d 888, 289 N.E. 2d 12, and cases cited therein.) The right to stop the work has large significance in determining whether an owner is in charge of the work within the meaning of the Act. (*Miller v. DeWitt*, 37 Ill.2d 273, 226 N.E.2d 630; *Isabelli v. Cowles Chemical Co.*) A permanent part of a structure may itself constitute a "scaffold" within the contemplation of the statute. *Louis v. Barenfanger*, 39 Ill.2d 445, 236 N.E.2d 724; *Halberstadt v. Harris Trust & Savings Bank*, 7 Ill.App.3d 991, 289 N.E.2d 90.

■■ In our opinion the jury could reasonably have found that under the arrangements entered into between the parties that defendants had sufficient connection with the operation of the work to make them persons in charge within the meaning of the Structural Work Act. Shanks and Compton were the only witnesses who testified concerning the arrangements for the work. Shanks stated that Compton owed Christopher money and that it was first agreed that Compton would do the work of turning the spouts himself. However, Compton came back and said that

his boss wanted him to do the work through Okaw Valley. Compton said it first started out that Shanks was going to engage him as an individual, then it was decided to do it under Okaw Valley. He turned a bill in for time and material and did other repair work agreed upon between him and Shanks on his own. From the foregoing there is no showing that defendant owner did not retain the right to control the work.

■■ The jury could also have found that the defendants are persons in charge because they had a right to stop the work if it were being done in a dangerous manner. Although the record in this case makes no mention of any right to stop the work by the defendants, the jury could have found that there was such a right if the work was being done in a dangerous manner. There is no question but that defendants had full and complete control of the premises at all times. Had Shanks observed Carruthers and Compton working in such a manner as to endanger the property of Christopher or the employees of Christopher, it could hardly be contended that Shanks as general manager could not stop the work or even order them off the premises if he so desired.

■■ The jury could also have found that it was implicit in the agreement that the permanent parts of the building were to be furnished by Christopher to be used as scaffolds or supports in performing the work. Compton testified that there could have been scaffolding built, but it would have been expensive and quite lengthy to build it. So it was at least the understanding of one of the parties to the agreement that permanent parts of the building were to be used as scaffolds and supports in doing the work. Since the jury could find that it was within the contemplation of the parties that permanent parts of the structure were to be used as supports or scaffolds in doing the work and that the defendants were to furnish them, it could have found that the defendants had sufficient connection with the operation to be in charge within the meaning of the Structural Work Act.

In *Harp v. Gulf, Mobile & Ohio R. Co.*, 66 Ill.App.2d 33, this court said at page 38:

"The purpose of summary judgment proceedings is to determine whether there is any genuine triable issue of fact which must be passed upon. [Citation.] If the pleadings, discovery depositions and exhibits, present a genuine issue as to any material fact, summary judgment should not be granted. [Citation.] The right of the moving party to summary judgment must be free from doubt. [Citation.] The affidavits filed in support of a motion for summary judgment will be strictly construed and must leave no question of the movant's right to judgment, but the affidavits filed in opposition thereto will be liberally construed. [Citation.]"

■■   For the foregoing reasons the judgment entered by the trial court in favor of the defendants is reversed and this case is remanded to the Circuit Court of Fayette County for trial on the merits.

Judgment reversed and cause remanded with directions.

CREBS, J., concurs.

Mr. PRESIDING JUSTICE EBERSPACHER dissenting:

The issue on appeal here is whether or not the trial court was correct in granting the motion for summary judgment. The motion was supported by the affidavit of the defendant John Shanks and the depositions of Shanks, Compton and plaintiff. No counter-affidavit was filed by plaintiff. The effect of the failure to file a counter-affidavit was to admit the facts as presented by the affidavit and depositions. In *Walsh v. Monumental Life Insurance Co.*, 46 Ill.App.2d 431, 435, 197 N.E.2d 124, 126, the court pointed out:

> "It is true, as contended by defendants, that where facts in support of a motion for summary judgment are set forth in an affidavit presented by the movant, the opposing party cannot rely solely on his complaint to rebut it, even though the complaint and answer taken alone do present a genuine issue of material facts."

The same court in reaching a similar conclusion in *Kapka v. Urbaszewski*, 47 Ill.App.2d 321, 326, 198 N.E.2d 569, 572 said, "Raising an issue in the pleadings does not preclude summary judgment".

I see no significance in the conversation between Compton and Shanks which is quoted at length in the opinion, nor the quoted testimony of Shanks. Those conversations did not result in a contract under which the work was done nor do they reflect any control of the work which was done by plaintiff as an employee of Okaw Valley Construction Company, with whom the contract to do the work was ultimately made. Despite the conversation between Compton and Shanks, and that on occasion Compton was employed by defendant to do similar work, the work being done at the time plaintiff was injured was being done by plaintiff and Compton as employees of Okaw.

The matters before the court negate the theory that defendant was in charge of the work, and consist of an affirmative showing of a total absence of intervention, control or supervision as demonstrated by the deposition of Compton, the foreman of plaintiff:

> "Q. Nobody with Christopher told you or Carruthers how to do this work you were doing?
>
> A. No. As far as I know, it was entirely up to us to do it the

way we felt it should be done. The only thing was we was to turn the pipe."

Further the deposition of plaintiff also expressly shows that defendants were not in charge of the work which plaintiff was doing.

"Q. Did John Shanks or anybody with B. C. Christopher and Company give you any directions on how to do this work?

A. No."

This evidence is controverted only by the unverified general allegation of the complaint. No facts are shown in either the complaint, depositions or affidavit indicating any charge or control of this particular operation by the defendant. See *Van Dekerhov v. City of Herrin,* 51 Ill.2d 374, 282 N.E.2d 723. In *Kaminski v. Missionary Sisters of the Sacred Heart,* 62 Ill.App.2d 216, 210 N.E.2d 794, the court considered a complaint which alleged that the defendant "was in charge of the work" and examined the pleadings, depositions and affidavits in determining the propriety of a summary judgment. It said at page 796 of 210 N.E.2d:

"The naked charge that Corbetta was 'in charge of the work' and that the scaffold was inadequate without any facts to support it, is, in our opinion, a conclusion of the pleader, which must be disregarded in considering the motion for summary judgment. See Supreme Court Rule 15 (Illinois Revised Statute 1963, Chapter 110, Section 101.15) which provides that affidavits in support of or in opposition to a motion for summary judgment 'shall not consist of conclusions but of facts admissible in evidence.'"

A summary judgment was also sustained in *Melvin v. Thompson,* 39 Ill. App.2d 413, 188 N.E.2d 497, where the mere allegation that defendants were in charge of the work was likewise unsupported by any facts.

The majority, without citing any authority concludes that the jury could have found that "defendants are persons in charge because they had a right to stop the work if it were being done in a dangerous manner". There is nothing in the record to indicate that defendant retained that right. But, even assuming that an owner was humane enough to stop the work if he determined the manner in which it was being done placed those doing it in a needless jeopardy, or practical enough to stop the work in the manner in which it was being done because it created an unnecessary hazard to property, such acts would not be the exercise of such control as would place him in charge of the work under the statute under the holdings in *Melvin v. Thompson, supra,* and *Loveless v. American Telephone and Telegraph Co.,* 40 Ill.App.2d 347, 189 N.E.2d 679.

In the former case the defendant contracted with the plaintiff's employer for the repainting of certain signs on a building owned by defen-

dant. Plaintiff was sent by his employer to perform such work and was injured when he fell off a scaffold. There was evidence from the pleadings, depositions and affidavits, that the defendant had instructed plaintiff that he was dissatisfied with a prior painting job and intended to "watch this job extra carefully" (188 N.E.2d at page 499). Further there was evidence that defendant had instructed plaintiff that he would stop the work as it progressed and would make no payment unless done to his satisfaction. Defendant instructed plaintiff, in great detail, as to the type of paint to be used, the time work was to be commenced and furnished the plaintiff with a ladder to gain access to the scaffolding. It also appeared that the defendant had inspected the paint which was used and had inspected the scaffolding rope itself, and had stated that it looked all right. The defendant had examined the work in progress and pointed to deficiencies. Still, when the plaintiff sought to impose liability on the owner contracting party, on the basis of the Structural Work Act, a summary judgment in favor of the defendant was entered and affirmed on appeal. The court said at page 500 of 188 N.E.2d:

"At most the activities of defendant Thompson can be considered as an effort to require compliance with the contract and to insure that the quality of work done was as agreed; he inspected the painting as it progressed and threatened to terminate the work if the job was not being done satisfactorily. In doing so he could not be considered by reasonable men to have been 'in charge' of the work, as required for owner-liability under the terms of the Scaffold Act. We, therefore, conclude that, taken in the aspect most favorable to the plaintiff, the pleadings, depositions, and counter-affidavit do not raise a genuine factual issue with respect to control by defendants of the painting operations. It follows that summary judgment for defendants was proper."

In *Loveless v. American Telephone and Telegraph Co.*, 40 Ill.App.2d 347, 189 N.E.2d 679, there was also an attempt to impose liability under the Act on the owner of the building on the theory that he was in charge of the work. There was evidence that the defendant's inspector or engineer could, if he observed a violation of statutory requirements, have terminated the job until such statutory requirements were complied with. Also it appeared that the owner's representative had authority to discuss any violation with the superintendent of the contractor. The court held at page 681 of 189 N.E.2d that the defendant was not "in charge" of the work.

"In this case there is no evidence of any kind that the American Telephone and Telegraph Company at any time had charge of the construction involving the violation of the Scaffold Act. The mere

fact that the defendant might, through notice or otherwise, call attention to and correct a violation of the law, does not of itself, involve any degree of control or supervision. Considering the evidence in its most favorable light, giving the plaintiff the benefit of its most reasonable intendments, there is a total lack of evidence that the defendant owner had charge or supervision of the work involving violation of the Act."

The court thereafter affirmed a judgment notwithstanding the verdict in favor of the defendant.

The majority also concludes without citing authority that "since the jury could find that it was within the contemplation of the parties that permanent parts of the structure were to be used as supports or scaffolds in doing the work and that the defendants were to furnish them it could have found that the defendants had sufficient connection with the operation to be in charge within the meaning of the Structural Work Act". The record does not show what defendants contemplated with reference to the manner in which Okaw's employees would do the work or what precautionary measures would be taken by either the workmen or their employer. But even assuming that defendants contemplated that plaintiff would stand upon the structure to do the work, ownership of the scaffold itself and being in charge of it is insufficient in law to constitute "having charge of the work so as to impose liability on the owner under the statute. In *Kobus v. Formfit Co.,* 35 Ill.2d 533, 537, 221 N.E.2d 633, 635, the court said:

"The Scaffold Act is a statutory enactment to protect those engaged in extra hazardous work, and recognizes a duty upon certain categories of individuals to use certain specified safeguards and standards of safety in the erection of structures where such work employs the use of scaffolds. It does not place a duty, and therefore a corresponding liability for its violation, merely upon the ownership of the premises upon which such construction is being undertaken. It places that duty among others upon an owner, 'having charge of such construction of a building * * *.' We did not there define what specific acts or factors would satisfy this statutory requirement, but we did hold that the mere fact of ownership of the premises was insufficient for liability."

The involved principal is more clearly stated in *Bruen v. Burton Auto Spring Corp.,* 130 Ill.App.2d 477, 481, 266 N.E.2d 177, 178:

"It is now settled that liability under the Structural Work Act cannot rest alone on the erection, control, or ownership of what causes the injury. See *Gannon v. Chicago, M. St. P. & P. Ry. Co., supra; Larson v. Commonwealth Edison Co.,* 33 Ill.2d 316, 211

N.E.2d 247; *Reed v. Johnson*, 55 Ill.App.2d 67, 74, 204 N.E.2d 136. For example, without proof that the person sought to be held liable was in charge of the work, ownership of planks that go to make a scaffold does not determine liability under the Act. *Schaffer v. Veach*, 61 Ill.App.2d 168, 209 N.E.2d 373.

Our study of the cases, particularly those cited by plaintiff leads us to conclude that in determining defendant's liability, it is irrelevant who had charge of the scaffold, unless this fact is related to having charge of the work. In *Vykruta v. Thomas Hoist Co., Inc.*, 75 Ill.App.2d 291, 221 N.E.2d 99, we held that one who furnishes equipment is not put in charge of the construction or of that part of the construction in which the equipment is used. '[M]ere renting of the equipment and the repositioning and repairing of equipment which has ceased functioning are not enough. In both instances there must be something more; the owner or the supplier must be directly connected with the operation.' 75 Ill.App.2d 291 at 303, 221 N.E.2d 99 at 105."

The principal is recognized in *Isabella v. Cowles Chemical Co.*, which the majority cites, wherein the court quoted the language of *Bruen* at 289 N.E.2d 17, "* * * liability under the Structural Work Act cannot rest alone on the erection, control or ownership of what causes the injury". Furthermore, the fact that the defendants herein contracted for the performance of the work is not only not controlling, but not in the least respect influential, since in every case involving the Structural Work Act, someone has contracted for the performance of the services. This fact alone is not persuasive in determining if the contracting party "has charge of" the work. It is required that the contracting party and the owner of the premises have a *direct connection with the repair operations* themselves. As stated by the Illinois Supreme Court in *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 211 N.E.2d 247, at page 252:

"It may be conceded that Sargent, like an owner, must have some direct connection with the construction and alteration operations before it can be deemed to be in charge of the work, and thus subject to duty and liability under the Act."

Since the facts shown in defendant's affidavit are admitted, since no genuine issue of fact was shown in the depositions and since the complaint is insufficient in itself to raise such an issue in a summary judgment proceeding, the trial court was correct in entering a summary judgment, and I would affirm.