JOHN DANIELS, Plaintiff-Appellant, *v.* A. H. WEISS *et al.,* Defendants-Appellees—(CHESTER BOWKER, Defendant.)

(No. 58389;

First District (5th Division)—January 18, 1974.

John D. Hayes & Associates, Ltd., of Chicago, for appellant.

Royce Glenn Rowe and Patrick E. Maloney, of McKenna, Storer, Rowe, White & Haskell, of Chicago, for appellees.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

Plaintiff, a professional house painter, was injured on November 6, 1968, when he fell from a scaffold while painting the windows of a building owned by defendant Weiss and defendant Myron Rischall (now deceased). Defendant Bowker was the building's resident janitor. Plaintiff's amended complaint alleged both negligence and willful violations of the Structural Work Act (Ill. Rev. Stat. 1971, ch. 38, pars. 60—69). By his

briefing in this court, however, plaintiff has abandoned the negligence count.

After discovery, defendants Weiss and Rischall moved for summary judgment on the grounds that they were not in charge of the work being performed on the building. In support of their motion, they filed excerpts from plaintiff's deposition, an affidavit of defendant Weiss, a written memorandum of the oral contract for the work entered into between Weiss and plaintiff's employer, Frazier Painting & Decorating ("Frazier"), and an affidavit of defendant Rischall. The trial court granted the motion under the authority of Ill. Rev. Stat. 1971, ch. 110, par. 57, finding that there existed no genuine issue of material fact and that defendants were entitled to judgment as a matter of law.

Plaintiff testified at his deposition that the day of the occurrence was his first day on that particular job, and that he was employed by Frazier. A Frazier foreman drove him and a coworker to the building. They were to paint and repair windows, and do whatever the janitor had for them to do. When they arrived on the job, Bowker, the building janitor, was present and the scaffolding had already been suspended from the building.

In his affidavit, defendant Weiss stated that he had a 75% ownership interest in the building and Myron Rischall owned the other 25%. The building was managed by Weiss' wholly owned company, A. H. Weiss & Company. He contracted with Frazier to scrape, putty, paint, and caulk 337 windows on the building. He had visited the building to check the progress of the work being done by Frazier, but he denied that he exercised any control over the Frazier employees. He did not provide any scaffolding for the project or exercise any control over its use. Rather, Frazier was given full "charge."

Olga Rischall stated in her affidavit that her husband, Myron Rischall, had owned a 25% interest in the building on the day of the occurrence; that she never contracted with Frazier, never hired or fired Frazier employees, and never visited the building.

The written memorandum of the contract described the work to be done as "Scrape, putty, caulk + paint two (2) full coats on (337) windows. Repair (5) + Replace (2) windows." It also stated, "All above work guaranteed to be of a good grade of paint and workmanship."

Plaintiff filed objections to the motion for summary judgment on the grounds that at the time of the occurrence Weiss and Myron Rischall owned the building, that Weiss, in his capacity as the sole proprietor of A. H. Weiss & Company, managed the building as the agent of the owners and employed defendant Bowker as janitor of the building, and

that Weiss, Myron Rischall, and A. H. Weiss & Company were in charge of the work through their agent and employee, Bowker. In support of his objections, plaintiff filed excerpts from his own deposition and that of Weiss.

In his deposition, defendant Weiss testified as to the ownership of the building on the date of the occurrence, and that A. H. Weiss & Company managed the building by virtue of an oral agreement which enabled Weiss to authorize all major work to be done on the building. Chester Bowker was the janitor of the building in November of 1968, and he was employed by Weiss individually and in his capacity as A. H. Weiss & Company.

In plaintiff's deposition, he testified that the janitor was "Chester Bowler, or Boker" and that neither plaintiff nor his partner had worked at that location before. The painters got their instructions with regard to the work that had to be done from the janitor, who showed them where the paint was, where the crew had left the scaffold the day before, and where broken windows were to be replaced. In addition, he told them where to start painting. At about 11:00, without his having experienced any difficulty with slippery scaffold ropes, plaintiff, along with his coworker, stopped working because it was near lunch time and it was raining. When they returned at approximately 11:40 A.M., the janitor said, "Get back up there and let's get it done. It should have been done already."

Both plaintiff and defendants filed excerpts from the deposition of Chester Bowker to support their respective positions. On September 11, 1972, the complete deposition of defendant Bowker was filed. Bowker testified that he was in charge of the building in question for a period of five years, including the date of the occurrence. He had been hired by Weiss and had the title of engineer. During the entire period, Weiss had visited the building once or twice a week, depending on the time of the month. Bowker was on the premises 24 hours a day, residing in an apartment on the first floor. His duties included cleaning, maintaining the boiler, replacing fuses, checking leaks and doing tile jobs in the bathrooms, changing water faucets, and clamping steam leaks inside the walls. Prior to the paint job, which had been going on for more than one month prior to the occurrence at issue, Weiss told him that the painters would be at the building some time in the next week to paint the building windows. He was asked to cooperate with the painters by using his master keys to let them in apartments to get to their scaffolding. Weiss had duplicates of these keys. Prior to the arrival of the painters, Weiss told Bowker, "Just watch and see that they are painting the windows or if they are not painting the windows."

When the painters first came on the job, they came to Bowker's apartment and wanted to know if they could store their equipment in there because they weren't going to start that day. On the first day of work, three painters showed up, bringing with them a scaffold that Bowker described in detail. They stored their equipment in the laundry room, but they left the scaffold hanging when they finished each day. Bowker did not have to unlock the laundry room to let the painters get their equipment, but they did have to ring his bell each morning to get into the building. He observed them for about five minutes when they were putting their scaffold up. He did not help them at all. He spoke to the three men who were on the job the first day at lunch time.

The painters were present on the job once or twice a week, and had spent approximately 18 days working prior to the occurrence. On each of the 18 days, he observed them painting at least part of the day. His chores in the building took him to places where he could not help but see the painters. He gained prior experience with scaffolding from a three-year period he spent as a tuckpointer. Each time he saw the painters, there was always a new man on the job. Bowker did not pay any attention to who was painting because he had lost interest in the painters.

During the paint job, Weiss came out to the building a couple of times. Bowker never saw Weiss give orders to the painters. On these visits, Weiss asked Bowker how many windows the painters had painted, and whether they had completed an entire side of the building. There was no Frazier foreman on the job, nor did Bowker see anyone from Frazier come out and observe the painters.

On the day of the occurrence there were only two painters on the job. Bowker thought it was funny that they came, because it had rained all night, and it was drizzling off and on during the morning. He observed them painting once, right after he had taken out the garbage. He had let plaintiff and his partner through a sixth-floor apartment to get to the scaffolding, and at that time he remarked to the painters, "It's kind of wet to be painting." To Bowker's knowledge, the painters were on the scaffold from the time they got there in the morning to the time of plaintiff's fall.

Further at his deposition, Bowker stated that he did not have authority to stop the work if the men were drinking on the job, but that if drinking occurred, he would inform Weiss the next time he saw him. He stated that he did not hire the painters and that they were not working for him. Later in his deposition Bowker was confronted with a statement taken prior to his deposition in which he stated that he would have stopped the work if he saw drinking because he did have that much

authority. He then went on to explain that Weiss never said anything to him about what he should do if he saw anybody drinking, that he did not think he would have authority legally to stop the drinking, but that he would encourage the men to quit drinking because of his past experience on scaffolding. When asked what he had meant by "authority," he stated, "Well, past experience as a security guard, I would say to them, 'I'd rather not have you paint.'"

On September 29, 1972, the trial court granted summary judgment to the moving defendants, Weiss and Olga Rischall.

The sole question presented on this appeal is whether there was any "genuine issue as to any material fact" so that judgment for defendants should not have been entered as a matter of law. (Ill. Rev. Stat. 1971, ch. 110, par. 57.) We think the trial court was correct in holding that there was none.

■■ The Structural Work Act was enacted to protect laborers engaged in extra-hazardous work. It establishes a duty upon certain categories of individuals to use specified safeguards and standards of safety where such work involves the use of scaffolds. Section 9 of the Act requires compliance with the provisions of the Act by "any owner * * * or other person having charge of the * * * repairing, alteration, * * * or painting of any building." (Ill. Rev. Stat. 1971, ch. 48, par. 69.) It has been construed as requiring that mere ownership is not enough, and that an owner must "have charge of" the work before he can be held liable under the Act. *Gannon v. Chicago, M., St. P. & P. Ry. Co.*, 22 Ill.2d 305, 175 N.E.2d 785.

■■ The Supreme Court has held that the statutory term "having charge of" is one of common usage and understanding; it is used in its conventional sense in the Structural Work Act. "[F]urther attempt at definition can only lead to confusion." *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 211 N.E.2d 247.

The only real indication that defendants had charge of the paint job being done by plaintiff was defendant Bowker's statement that he had authority to stop the work. But his explanation of what he meant by "authority," coupled with his admission that defendant Weiss, his employer, never gave him this authority, renders his tentative assertion worthless as evidence that either he or Weiss was in charge. The fact that Bowker cooperated with the painters by allowing them access to the work site and to their materials hardly puts him in charge. Nor does his informing men new to the job where the previous day's painters had left off. Nor does his showing plaintiff the windows that were to be painted.

In the case of *Melvin v. Thompson*, 39 Ill.App.2d 413, 188 N.E.2d 497,

the plaintiff was a painter who sought to recover under the Structural Work Act for injuries sustained when he fell from a scaffold while painting a sign on a building owned by the defendant. The court affirmed summary judgment for the defendant-owner in the following factual situation which we consider stronger on behalf of the plaintiff than that in the instant case: the owner went into detail with respect to what was to be done, the type of paint to be used, and the time at which work was to be finished; he furnished a ladder to gain access to the roof from which the scaffolding was then hung; he examined the scaffolding rope and advised a worker that it did not appear sturdy; he tested its strength and told the worker, "it looks as if it will hold"; he inspected the paint; he pointed out where insufficient paint was being used; he instructed that the old paint be scraped off; he told the painters that the paint should be thinned out; he told a painter to move in various directions; plaintiff-painter testified at his deposition that while he was painting, a man came out and told the painters to "be sure and scrape it good."

The court in *Melvin* concluded that:

> "At most, the activities of [the owner] can be considered as an effort to require compliance with the contract and to ensure that the quality of work done was as agreed; he inspected the painting as it progressed and threatened to terminate the work if the job was not being done satisfactorily. In so doing, he could not be considered by reasonable men to have been 'in charge' of the work, as required for owner-liability under the terms of the Scaffold Act." 39 Ill.App.2d at 417-18, 188 N.E.2d at 500.

■■ In all of the foregoing, the argument has related to the question of having charge of the work, and we believe that the trial court was correct in holding that on this record defendants were not in charge of the work within the meaning of the statute. Further, however, liability can be based only upon a *willful* violation of the Act and we are of the opinion that the record failed to show liability in this regard also.

After oral argument in this case, we happened upon the recently published case of *Carruthers v. B. C. Christopher & Co.*, 13 Ill.App.3d 108, 300 N.E.2d 1. There, a divided court reversed summary judgment for the defendants under the Structural Work Act, but we respectfully disagree with the majority opinion. The court based its decision on grounds none of which was supported by any authorities. Principally, the court appeared to hold that the jury could have found that defendants were in charge of the work by inferring that defendants had a right to stop the work if it were being done in a dangerous manner.

We are not persuaded that such an inference may properly be drawn, or, if it were, that it could form the basis of a willful violation of the

Act. The proposition impresses us as being less strong than an affirmative allegation in a complaint that the defendant was in charge of the work, yet such a naked allegation, being a conclusion of the pleader, is not controlling on consideration of a motion for summary judgment. *Kaminski v. Missionary Sisters of the Sacred Heart*, 62 Ill.App.2d 216, 210 N.E.2d 794.

Rather do we agree with Presiding Justice Eberspacher's dissenting remark:

> "But, even assuming that an owner was humane enough to stop the work if he determined the manner in which it was being done placed those doing it in a needless jeopardy, or practical enough to stop the work in the manner in which it was being done because it created an unnecessary hazard to property, such acts would not be the exercise of such control as would place him in charge of the work under the statute under the holdings in *Melvin v. Thompson, supra,* and *Loveless v. American Telephone and Telegraph Co.,* 40 Ill.App.2d 347, 189 N.E.2d 679." *Carruthers v. B. C. Christopher & Co.,* 13 Ill.App.3d at 116, 300 N.E.2d at 7.

The judgment is affirmed.

Affirmed.

DRUCKER and LORENZ, JJ., concur.