EDWARD SIMMONS, Plaintiff and Counterdefendant-Appellee, *v.* UNION ELECTRIC COMPANY, Defendant and Third-Party Plaintiff-Appellant (Sachs Electric Company, Third-Party Defendant and Counterplaintiff-Appellee).

Fifth District No. 83—197

Opinion filed January 10, 1984.—Rehearing denied February 7, 1984.

Pope and Driemeyer, of Belleville (Karl D. Dexheimer and Thomas F. Hennessy III, of counsel), for appellant.

Amiel Cueto, of Cueto and Moore, Ltd., of Belleville, for appellee Edward Simmons.

Bruegge and Becker, of Breese (William J. Becker, of counsel), for appellee Sachs Electric Company.

PRESIDING JUSTICE WELCH delivered the opinion of the court:

Plaintiff Edward Simmons commenced this action in the circuit court of St. Clair County to recover damages for personal injuries suffered in a fall from a ladder at the Cahokia power plant owned by defendant Union Electric (UE). The complaint was based upon the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, par. 60 *et seq.*) and common law negligence. UE, in turn, filed a third-party complaint seeking indemnity or contribution from the plaintiff's employer, electrical contractor Sachs Electric Company (Sachs). Following a bench trial, the court entered judgment for the plaintiff and against UE on the Structural Work Act count of the complaint. Damages were assessed at $219,000. Judgment was also entered against UE and in favor of Sachs on the third-party complaint.

UE appeals from this judgment and presents several issues to this court. It first contends that the trial court should have entered judgment in its favor on the Structural Work Act count of the plaintiff's complaint. It also maintains that the award of damages was excessive, that the court erroneously failed to grant it contribution or indemnity on the third-party complaint, and that the trial judge erred in not recusing himself due to a credit dispute with UE. Sachs denies that UE was entitled to contribution or indemnity from it, but argues that if we held otherwise, then it adopts UE's arguments pertaining to the award of damages and the trial judge's duty to recuse himself. Sachs further asserts that if UE is granted contributions or indemnity from it, then Sachs should be allowed indemnity or contribution from the plaintiff.

Simmons was injured on December 19, 1978, at the site of a power plant owned by UE in Cahokia, Illinois. The plant was built in 1923, and much of it is below the water level of the Mississippi River. It had been determined that the plant was no longer suitable for the generation of electricity, and so in 1976, those functions ceased at the plant. UE kept the site in use as an electrical substation until October 1977, when the plant was taken out of service entirely. From that point, UE did not maintain permanent, full-time employees at the plant. Instead, it entered into contracts with two independent concerns.

One of the contractors, Easterling and Steinmetz, provided security personnel for the plant. The other contractor was Sachs. Pursuant to its first contract proposal submitted to and accepted by UE, Sachs installed an electrical system to furnish outside power to certain sections of the plant which had been powered previously by elec-

tricity generated within the plant. This power would allow the continued operation of pumps, lights, cranes and other devices which would keep the plant's premises in a secure and dry condition pending location of a buyer. UE engineers designed and defined the scope of the new electrical system.

Sachs' second contract proposal resulted in a time and materials contract whereby Sachs would maintain and repair the system which it had installed. This contract did not require Sachs to keep full-time personnel on the premises of the plant. If a problem arose with the electrical system, UE would normally become aware of it through its employees who visited the plant on an occasional basis or from security personnel. UE would then contact Sachs, which would dispatch personnel to the plant.

On December 19, 1978, the plaintiff was at another jobsite when his foreman informed him of a trouble call at the plant. The plaintiff, a journeyman electrician, left with apprentice Jim Perry for the plant. Perry died before trial from injuries sustained in an automobile accident. When the men arrived at the plant, they learned that there had been a pump failure in the plant's north ash pit. The pit is a structure of several levels, encased in concrete and primarily below ground level. The bottom level, which is approximately 15 feet in depth, was almost entirely flooded. That level of the pit is separated from the middle level by a concrete floor, upon which rest the motors to two permanent sump pumps. Those pumps were designed to drain water from the entire pit, including the bottom level. A mobile, temporary sump pump had been placed at the bottom of the pit to remove water in case the permanent pumps did not work.

The plaintiff was not certain whether he and Perry were met by a UE employee at the plant or whether they were met by a security guard. Nonetheless, they were shown to the pit where they observed the flooding. They went to the switch box and determined that an electrical failure had occurred in the temporary pump, not in the permanent pumps. The permanent pumps had not worked because of a defective float, which had not activated them when the bottom level of the pit became flooded. The plaintiff and Perry adjusted that float and then used the two permanent pumps to rid the bottom level of water.

The plaintiff was of the opinion that several fuses had been blown on the temporary pump. In any case, it was decided that the pump had to be removed from the pit for inspection and repair. Because the pump was heavy, it could not be lifted by hand, and a hoist had to be attached to the pump, which could then be lifted by a winch on a

truck at ground level. The plaintiff and Perry dropped the hoist into the bottom of the pit, and also extended a temporary light into that area. To gain access to the pump, the plaintiff started to descend to the bottom of the pit by way of a ladder which had been affixed to a concrete wall. As he did so, his feet slipped from one of the rungs, and he fell to the floor, landing on some debris. At trial, the plaintiff was of the opinion that he slipped from the ladder because it became covered with oil during the removal of the water from the pit. In a deposition taken before trial, he stated that he did not know if there was anything on the ladder that caused him to slip, and he did not know why he fell.

APPEAL OF UE AGAINST PLAINTIFF

■ The threshhold issue presented by UE is whether the plaintiff was covered by the Structural Work Act when he was injured. The Act covers support devices used in "the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure." (Ill. Rev. Stat. 1981, ch. 48, par. 60.) The device which the plaintiff was attempting to repair when he fell was a temporary sump pump. This pump was never attached to the pit itself, but had only been set in place at the bottom of the pit and, in fact, had been moved by Sachs "a number of times." Thus, according to UE, the plaintiff was in the process of repairing a piece of machinery and was not engaged in structural work at the time of his injury. UE concludes that he was therefore not covered by the Act.

Whether a plaintiff was engaged in structural work when he was injured is a question of law. (See, e.g., *Long v. City of New Boston* (1982), 91 Ill. 2d 456, 440 N.E.2d 625; *Cooley v. Central Illinois Public Service Co.* (1982), 110 Ill. App. 3d 685, 442 N.E.2d 1330; *Kelly v. Northwest Community Hospital* (1978), 66 Ill. App. 3d 679, 384 N.E.2d 102.) As the language of the Act plainly indicates, this inquiry requires a two-part analysis. First, was the plaintiff erecting, altering, removing, painting or cleaning (*Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 302 N.E.2d 64) something? Second, was the object of the plaintiff's activities a house, building, bridge, viaduct or other structure? We have no doubt that the plaintiff was employed in repair work at the approximate time he was injured. The question then becomes whether he was repairing a structure.

■ ■ Before we can answer this question, we must determine the temporal limits to our inquiry into the plaintiff's activities. In other words, must we look only at the specific action undertaken by the plaintiff as he was injured, or should we consider the plaintiff's

role in a larger project? This can be quite significant in many cases. For example, if a carpenter was injured while nailing together boards which had not yet been attached to a building under construction, it could be argued that the carpenter was working on lumber and not on a structure, when he was injured. However, the Act is to be given a liberal construction to effectuate its purpose of protecting persons in the extrahazardous occupations of working in and about the construction, repair, alteration or removal of structures (*McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 151, 317 N.E.2d 573, 576), and to ask only what the plaintiff was doing at the precise moment of injury would not further that purpose. Courts have instead attempted to ascertain whether the actions of the plaintiff were connected with, and significantly furthered, one of the activities enumerated in the Act. (*McNellis v. Combustion Engineering, Inc.; Prange v. Kamar Construction Corp.* (1982), 109 Ill. App. 3d 1125, 441 N.E.2d 889; *Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 440 N.E.2d 973; *Quinn v. L.B.C., Inc.* (1981), 94 Ill. App. 3d 660, 418 N.E.2d 1011.) If the plaintiff's actions, seen in a broad context, are not an integral part of the erection, alteration, removal, painting or cleaning of a structure, then he is not covered by the Act as a matter of law. *Cooley v. Central Illinois Public Service Co.; Allen v. Godar* (S.D. Ill. 1979), 476 F. Supp. 172.

Under these principles, we can see that UE's argument is based on an unduly narrow view of the scope of our inquiry into the connection of the plaintiff with a structural work activity. The plaintiff was not sent to the plant solely to repair the mobile, temporary sump pump. His task was to repair the entire pump system—permanent and temporary—and to make repairs on the electrical system if that was necessary to accomplish that goal. The question in this case is therefore whether the pump system in the ash pit was a structure under the Act.

In *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, 290 N.E.2d 219, the plaintiffs' decedent was killed by the collapse of a trench, in which he was installing sewer tiles in connection with townhouse units under construction by the defendant. The question presented to the supreme court was whether the sewer system upon which the plaintiffs' decedent had worked was a structure. The court held that the system was in fact a structure, and also agreed with the appellate court that work performed below ground is not necessarily not work on a structure.

The pump system in UE's ash pit is functionally similar to the sewer system in *Navlyt*. Both are affixed to the buildings they serve, and both systems, by preventing water damage to those buildings, are

important in ensuring that the buildings will not suffer major structural damage. In fact, given this function, it might be said that the plaintiff's repair of the pump system was tantamount to repairing the pit itself. We believe that the plaintiff was repairing a structure when he fell from the ladder and was therefore covered by the Structural Work Act as a matter of law.

■ UE further contends that even if the plaintiff was engaged in structural work, the court erred in finding that UE was "in charge of" the work at the power plant. It is UE's position that we should review this question as an issue of law, not an issue of fact and that we are not limited to reversing the decision of the trial court only if it is contrary to the manifest weight of the evidence. In *Crum v. Gulf Oil Corp.* (1979), 70 Ill. App. 3d 897, 388 N.E.2d 1008, we held that the "manifest weight of the evidence" standard did not apply to our review of a case in which uncontroverted facts were determinative of the issue presented on appeal. There, the parties stipulated to the facts presented in transcripts of two previous trials. In this case, no stipulation has been entered into and there are several factual questions which are disputed. For example, at different times, the plaintiff gave different answers to the questions of whether a UE employee met him at the plant when he first arrived, whether oil on the ladder was the reason for his fall, and how many times he had visited the plant before the accident. These contested facts, among others, show that whether UE was in charge of the work was a factual determination which will not be disturbed unless contrary to the manifest weight of the evidence. *Scrimager v. Cabot Corp.* (1974), 23 Ill. App. 3d 193, 318 N.E.2d 521.

■ The phrase "having charge of," as included in section 9 of the Structural Work Act (Ill. Rev. Stat. 1981, ch. 48, par. 69) is not synonymous with the exercise of supervision and control over the work, nor with the retention of the right to exercise that supervision and control. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247.) It is instead a generic term, one which has been read broadly by our courts. (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348.) Whether a party has charge of the work performed is a question which requires attention to a number of different factors. Recently, in *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 445 N.E.2d 39, we enumerated many of the factors which have been deemed significant by the courts in determining whether a party is in charge of the work. These include, but are not limited to, (1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3)

constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change orders; (7) the right to stop the work; (8) ownership of the equipment used at the jobsite; (9) a party's familiarity with construction customs and practices; and (10) whether a party was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits. (*Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11, 445 N.E.2d 39, 42.) Any of these conditions, if present, will be relevant to whether a party has charge of the work, but, contrary to the assertions in the plaintiff's brief, the mere presence of one of the factors does not require a finding that a party is in charge of the work.

Consistent with the analysis formulated in *Chance* and other cases, it has been held that the status of ownership of premises on which work was being done does not, of itself, render the owner in charge of the work. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403; *Daniels v. Weiss* (1974), 17 Ill. App. 3d 294, 308 N.E.2d 46.) UE insists that it was no more than the owner of the power plant and was therefore not in charge of the work. There were no permanent UE employees at the plant during the period in question, nor was a UE employee at the site when the plaintiff was injured. Under the contract between Sachs and UE, the work at the plant was "to be performed under the general direction, supervision, and responsibility of" Sachs, and Sachs was required to "exercise due care and take all appropriate safety precautions necessary or advisable for the prevention of accidents." The contract also obligated Sachs to provide its workers with tools and equipment, including safety equipment. The plaintiff testified that, with the exception of certain hand tools owned by him, he would look to Sachs to obtain equipment necessitated by the job. Sachs maintained a room at the plant for the storage of equipment, but the plaintiff recalled that that room was not used until after the accident. According to the plaintiff, if he needed additional workers to complete a particular task, he would seek them from Sachs.

■ All of this evidence furthers UE's claim that it was not in charge of the repair work performed by Sachs. However, there are other facts which tend to establish that it did have that charge of the work. As noted above, the scope of the electrical system for which Sachs initially submitted a bid was set by UE engineers. The contract for the maintenance of that system provided that although the work was to be done pursuant to the direction and supervision of Sachs, it was to be "subject to inspection and final acceptance" by UE. At

trial, UE senior supervising engineers Paul Brendel and David Klumb testified that they visited the plant approximately once every week or two during its closed period. Brendel explained that a purpose of those visits was to ensure that the plant was kept in a secure and dry condition so that it could be shown to prospective purchasers. This necessitated determining if "the contract was working in a sensible fashion" and if the services of Sachs were needed. It must be conceded, also, that Sachs' personnel were not sent to the plant unless specifically requested by UE employees to perform maintenance work. Finally, the contract stated, in a clause entitled "Inspection by Company," that Sachs must give UE's engineers "free access to the work and whenever requested shall furnish them with full information as to the progress of the work in its various stages."

This case is somewhat unusual among Structural Work Act cases, for there was no continuous activity at the jobsite. We therefore do not view the absence of permanent UE employees from the power plant as particularly significant. More important, we believe, was UE's guiding role in delineating the extent of the electrical system project, in summoning Sachs when work needed to be done, and in periodically inspecting the premises of the plant to see if the maintenance had been completed. The presence of agents on the jobsite with the authority to inspect the work has been deemed important in other decisions upholding findings that a party was in charge of the work. (*Ilic v. Henry Crown & Co.* (1981), 97 Ill. App. 3d 231, 422 N.E.2d 892; *Smith v. Georgia Pacific Corp.* (1980), 86 Ill. App. 3d 570, 408 N.E.2d 117.) This factor, among others, demonstrates that in this case, the trial court's ruling that UE was a party in charge of the electrical maintenance work was not contrary to the manifest weight of the evidence presented at trial.

Next, UE maintains that the plaintiff did not show that it wilfully failed to comply with the Act. It is only a wilful failure to comply with the Structural Work Act which will subject a party to liability. (Ill. Rev. Stat. 1981, ch. 48, par. 69.) A wilful violation of the Act occurs when one having charge of the work knows that a dangerous condition exists on a support device or, by the exercise of reasonable care, could have discovered the existence of the condition. (*Peoples v. Granite City Steel Co.* (1982), 109 Ill. App. 3d 265, 440 N.E.2d 363.) UE reasons that the only way it could have known about the oil on the ladder was through Sachs, and the only way that Sachs could have discovered the condition was if the plaintiff learned of it. But, when asked at trial if he knew that there was oil on the ladder before he began to descend, the plaintiff consistently replied that he did not,

and also stated that there was no way that he could have prevented the accident. From this evidence, UE concludes that it could not or should not have known of the oil on the ladder.

However, the fact that the plaintiff was not aware of the dangerous condition of the ladder does not undermine the trial court's decision that UE wilfully violated the Act. Kenneth Bridegroom, the manager of UE's mechanical engineering department, testified that he was familiar with the occasional flooding of certain portions of the plant, such as the ash pits. According to Bridegroom, oil could become mixed with the flood waters through contact with greasy equipment in the pits, or possibly through drainage from the powerhouse itself. UE engineer David Klumb agreed with this explanation and recalled that upon the flooding of the plant in March 1978, UE hired a company to remove oil after the flood water was removed. Sachs' vice-president Larry Walker noted that anyone who had worked around the pits after a flood would have seen the oil and debris floating on the water and would have prior knowledge that any surface which had been submerged in one of these floods would be oily. In answer to questioning posed to him in a pretrial deposition, the plaintiff admitted that perhaps he should have known that there would have been oil on the ladder.

■ This evidence indicates that although neither the plaintiff nor UE knew that there was oil on this particular ladder, UE had the opportunity to learn of the oily conditions in the flooded areas of the plant, and in fact, its employees were knowledgeable about previous instances where the flooding had left oil-covered surfaces in its wake. Since, according to the accepted test for the existence of a wilful violation, such a violation occurs if a dangerous condition could reasonably have been discovered (*Moore v. Clearing Industrial District, Inc.* (1978), 64 Ill. App. 3d 391, 380 N.E.2d 1063), the absence of actual knowledge of the condition by UE is not a logical answer to the finding of a wilful violation. The creation of slippery surfaces after flooding was not a momentary, unique problem which would have been difficult to detect. It was instead a periodic occurrence known to UE employees. Under this evidence, the trial court did not err in deciding that UE wilfully violated the Act.

■ UE challenges the amount of damages awarded to the plaintiff as excessive. The three primary witnesses on the issues pertaining to those damages were the plaintiff, orthopedic surgeon Ronald Hertel and Jim Hankins, assistant business manager for Local 309, International Brotherhood of Electrical Workers. Hankins, who handles the referral procedure at the union's hiring hall, was asked several hypo-

thetical questions concerning the plaintiff's future employability. UE asserts that this testimony constituted error because Hankins, who is not medically trained, was required to assume the plaintiff's medical condition to answer those questions. We need not determine whether Hankins' testimony was improperly admitted at trial, because, even disregarding that evidence, the record supports the award of damages.

After the accident, Dr. Hertel diagnosed the plaintiff as having chondromalacia of the patella, which is a wearing of the smooth cartilaginous surface of the kneecap. He also suffered a tear of the medial meniscus, or the cartilage on the inside of the knee. The plaintiff complained of pain in his right knee while climbing stairs after the accident, and he did not feel that pain before the accident. Dr. Hertel explained that the tear of the meniscus was unequivocally caused by the accident, but he could not say within a reasonable degree of medical certainty whether the accident contributed to the chondromalacia. He was of the opinion that the plaintiff had developed some sort of malalignment of the connection between the patella and the femur, and this pre-existing condition probably arose before the plaintiff reached skeletal maturity. Dr. Hertel was uncertain how much of the chondromalacia existed before the accident because of that malalignment, and thus he could not state whether the accident accelerated the chondromalacia.

The plaintiff worked continuously between the time of the accident and January 1980. At that time, he was hospitalized for approximately a week to have the torn portion of the meniscus removed. The plaintiff was on crutches for three weeks after the surgery, and could not return to work until May 1980. Dr. Hertel had released him for work, without restrictions, about a week earlier. In late May 1980, a procedure known as a patella shaving was performed on the plaintiff as an in-patient. Dr. Hertel again released him to return to work without restrictions in July 1980. Hertel testified that he had no contact with the plaintiff as a patient since that time, and in fact, scheduled an appointment with the plaintiff in September 1980, but the plaintiff did not show up. The plaintiff denied missing any appointments with Hertel.

After the accident, the plaintiff continued to work for Sachs for several months, primarily at Granite City Steel Company. He was informed that he was going to be transferred to another assignment, which would require him to do a certain amount of heavy lifting. The plaintiff then left the employment of Sachs because he was unable to do heavy lifting due to the pain in his right knee. He went to the un-

ion hall and was hired by Wright Electric. The Granite City job paid the plaintiff $1,900 a week because the plaintiff was assigned to work a considerable number of overtime hours. The Wright job paid him $1,339 per week less, and, as the Granite City job lasted for eight weeks after the plaintiff left Sachs, the plaintiff estimated that he lost $10,712 in wages by changing assignments. Between the first and second surgeries, the plaintiff missed 16 weeks of work at Wright, at a salary of $581 per week, for a wage loss of $9,296. After the second surgery, the plaintiff lost $2,324 in wages before he started to work for Lowery Electric, which currently employs him. In 1981, the plaintiff's gross income was $33,760, while, by August 13, 1982, he had earned $19,236. Adding the losses due to the departure from Sachs and the missed time after surgery, the plaintiff estimated that, to the time of trial, he lost a total of $22,332 in wages because of the accident. The plaintiff also contends that he lost at least $4 per hour in earning capacity because he no longer worked as a foreman after the accident. However, it is difficult to quantify that loss because the plaintiff did not work exclusively as a foreman prior to the accident and the evidence does not establish what proportion of his employment was as a foreman before the accident.

The plaintiff incurred $5,249 in doctor and hospital bills as a result of his injuries. Dr. Hertel stated that the surgical scars will be permanent, and the plaintiff will develop osteoarthritis in his right knee at a rate faster than that expected by an individual without the plaintiff's condition. He believed that the plaintiff may need surgery in the future to relieve recurring symptoms of chondromalacia. He also stated that the plaintiff suffered permanent injury as a result of the accident. At trial, the plaintiff testified that he continued to have pain after the accident, and his injuries have limited his ability to perform certain types of work. For example, he noted that his right knee frequently goes out on him while climbing, and thus he can no longer climb very high with safety. He also cannot climb stairs or ladders regularly on the job because his knee would give him pain. Finally, the plaintiff testified that that pain curtailed his ability to lift heavy objects, as is occasionally required in his employment.

An award of damages is excessive if the amount falls outside the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. Damages, being particularly within the province of the trier of fact, will not be disturbed on appeal unless obviously the result of passion or prejudice. (*King v. City of Chicago* (1978), 66 Ill. App. 3d 356, 384 N.E.2d 22.) Comparison to other awards is not often helpful, but we should keep in mind

such factors as the permanency and extent of the injuries suffered, the plaintiff's age, the possibility of deterioration in the future, the medical expenses incurred, past and future wage losses, and any restrictions which the injuries may have placed on the daily activities of the plaintiff. Here the plaintiff was 47 years old at the time of trial, lost at least $22,000 in wages and incurred $5,200 in medical expenses. His injuries are permanent and disfiguring, restrict his movement at home and at work, and will become progressively worse, possibly requiring additional surgery. With this evidence, we believe that the award of damages lies within the realm of reasonable compensation (see *Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 450 N.E.2d 824; *Kottmeyer v. Consolidated Rail Corp.* (1981), 98 Ill. App. 3d 365, 424 N.E.2d 345), and is therefore affirmed.

 ██ As its final assignment of error against the plaintiff, UE insists that the trial judge erred in not recusing himself *sua sponte* from this case because of an acrimonious utility bill dispute concerning service to the judge's residence. This argument is of course equally applicable to UE's appeal against Sachs. No evidence pertaining to the credit dispute was presented to the trial court, but before this case was argued, UE moved to amend the record on appeal to include the affidavit of one of its customer service supervisors along with several records relevant to the credit status of the trial judge with UE. We denied this motion to amend the record, and we adhere to our original ruling.

Generally, a party may not supplement the record on appeal with new evidence never considered by the trial court. (*Kohler v. Central & Southern Truck Lines, Inc.* (1977), 45 Ill. App. 3d 621, 360 N.E.2d 89.) Supreme Court Rule 329 (87 Ill. 2d R. 329) does allow supplementation of the record "to present fully and fairly the questions involved" but this rule has been construed as being limited to the amendment of the record with matter which was before the trial court. (*People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408.) Moreover, in considering a motion to amend the record, the reviewing court must be mindful of the fairness of granting or denying such a motion. (*Denniston v. Skelly Oil Co.* (1977), 47 Ill. App. 3d 1054, 362 N.E.2d 712.) Even if the affidavit and the trial judge's credit record were proper material with which to supplement the record, and not new matter on appeal, we believe that it would be unfair to the other parties to grant UE's motion to amend the record. That motion alleges that the dispute with UE occurred in November 1981, approximately nine months before trial in this case. The knowledge gained by a corporate employee or agent in the scope of his or her employment

will be imputed to the corporation (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 434 N.E.2d 511), and therefore, UE had knowledge of the credit dispute long before trial, even if its trial counsel did not. We confirm our original denial of UE's motion to amend the record.

Because there is no evidence pertaining to the alleged conflict of interest by the trial judge, we cannot consider those issues. The judgment in favor of the plaintiff and against UE for $219,000 is accordingly affirmed.

APPEAL OF UE AGAINST SACHS

UE maintains that the trial court erred in entering judgment against it and in favor of Sachs on the third-party complaint. It argues that the evidence shows that Sachs was liable to it because of an indemnity clause in the maintenance contract between Sachs and UE or because of the existence of a pretort relationship which supports a claim for common law indemnity or contribution. We doubt that the indemnity clause is enforceable (see *Cox v. Lumbermens Mutual Casualty Co.* (1982), 108 Ill. App. 3d 643, 439 N.E.2d 126), but we need not consider UE's contractual indemnity or contribution arguments, for we find that UE was entitled to common law indemnity from Sachs as a matter of law.

Indemnity is available to a Structural Work Act defendant whose conduct is "passive" or "minor fault" in comparison to the "active" conduct or "major fault" of the third-party defendant. (*LeMaster v. Amsted Industries, Inc.* (1982), 110 Ill. App. 3d 729, 442 N.E.2d 1367.) Characterizing conduct as active or passive involves a weighing of the relative faults of each party. (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628.) The failure of a party to discover a defective support device does not constitute active conduct under the Act. (*Gadd v. John Hancock Mutual Life Insurance Co.* (1971), 5 Ill. App. 3d 152, 275 N.E.2d 285; *Lindner v. Kelso Burnett Electric Co.* (1971), 133 Ill. App. 2d 305, 273 N.E.2d 196.) Nor is a party rendered actively in violation of the Act by ensuring that a contractor or subcontractor made satisfactory progress and that its work conformed to specifications. *Kleeman v. Fragman Construction Co.* (1980), 91 Ill. App. 3d 455, 414 N.E.2d 1064; *Nogacz v. Proctor & Gamble Manufacturing Co.* (1975), 37 Ill. App. 3d 636, 347 N.E.2d 112.

In support of the trial court's judgment on the third-party complaint, Sachs argues that UE's participation in the maintenance of the plant amounted to more than ensuring that the contract was per-

formed, and its dereliction under the Act consisted of more than the mere failure to discover the oil on the ladder. It asserts that UE had the responsibility to remove debris and oil from the premises, and UE in fact hired an independent contractor to clean the plant after the March 1978 flood.

■ Another way to state the issue presented in an indemnity action under the Act is that a party is entitled to indemnity if its conduct only secondarily contributed to the plaintiff's injury and the party did not breach an affirmative duty owed to the plaintiff. (*Svenson v. Miller Builders, Inc.*) As we noted earlier, the contract between UE and Sachs placed the responsibility to "take all appropriate safety precautions necessary or advisable for the prevention of accidents" upon Sachs, and required Sachs to provide its workers with needed equipment, including safety equipment, such as rags to clean up any working surfaces. The plaintiff testified that if he needed additional material or manpower to do the job more safely, he would have obtained them from Sachs, not UE. Moreover, there were no UE employees at the ash pit when the plaintiff was working on it.

■ This evidence reveals a qualitative difference between the role of UE and the role of Sachs in contributing to the plaintiff's accident. UE, while "in charge" of the maintenance, acted only in a limited capacity at the plant, confining itself largely to determining whether maintenance work had been done properly. It had no employees at the plant when the plaintiff was injured. Sachs, on the other hand, was entrusted with the details of the work, including those pertaining to safety. This relationship, arising by contract, created an affirmative duty to the plaintiff which Sachs, rather than UE, was primarily responsible for breaching. Consequently, a comparison of the fault of UE with the fault of Sachs reveals that Sachs was guilty of active or major fault as a matter of law. (*Rynders v. Sangamo Construction Co.* (1982), 103 Ill. App. 3d 552, 431 N.E.2d 1357; *Jones v. McDougal-Hartmann Co.* (1969), 115 Ill. App. 2d 403, 253 N.E.2d 581.) The judgment against UE on its third-party complaint must therefore be reversed, and judgment is accordingly entered against Sachs for indemnity for the damages awarded the plaintiff.

APPEAL OF SACHS AGAINST PLAINTIFF

■ Sachs argues that, in the event that we find, as we have done, that UE is entitled to indemnity from it, then Sachs is entitled to implied indemnity or contribution from the plaintiff. Sachs has not perfected a cross-appeal from the judgment of the trial court. Normally, when an appellee does not file a cross-appeal, the reviewing

court will be confined to issues raised by the appellant, and will not consider issues presented by the appellee, except to the extent that they are related to the appellant's issues. (*Material Service Corp. v. Department of Revenue* (1982), 105 Ill. App. 3d 74, 434 N.E.2d 763; *National Football League Properties, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.* (1975), 26 Ill. App. 3d 820, 327 N.E.2d 247.) But this rule does not prevent us from considering Sachs' assignment of error against the plaintiff. It should be remembered that Sachs was an entirely successful litigant in the court below, and its indemnity or contribution claim against the plaintiff does not seek reversal or modification of the judgment as entered in the trial court. That claim is an alternative argument, directed against a possible modification of the judgment by this court. (Compare *Lazarich v. Zadeika* (1966), 78 Ill. App. 2d 236, 223 N.E.2d 231 (abstract).) We do not see that any purpose would be served in requiring an appellee to file a cross-appeal in order to preserve conditional arguments against action which may be ordered by this court, and therefore Sachs' argument against the plaintiff is properly before us.

Due to the order in which the briefs were filed in this case, the plaintiff has not responded to Sachs' argument against him. Appellant UE's brief was filed on July 1, 1983, the plaintiff-appellee's brief was filed on August 31, 1983, and appellee Sachs' brief was filed on September 8, 1983. Nonetheless, deciding this issue will not prejudice the plaintiff, for he had the opportunity to address it by requesting leave to file a supplemental brief (*Show of Shows, Inc. v. Illinois Liquor Control Commission* (1967), 86 Ill. App. 2d 109, 230 N.E.2d 268) or at oral argument. On the other hand, his failure to address that issue does not require that it is waived (*Cohn v. Receivables Finance Co.* (1972), 7 Ill. App. 3d 869, 288 N.E.2d 894), especially given the unusual circumstances of a conditional argument raised by one appellee against another.

As we turn to the merits of Sachs' argument, we are directed to cases such as *Brown v. Village of Shipman* (1980), 89 Ill. App. 3d 162, 411 N.E.2d 569, and *National Oats Co. v. Volkman* (1975), 29 Ill. App. 3d 298, 330 N.E.2d 514. In *Brown* and *Volkman*, defendants or third-party defendants in actions under the Structural Work Act were allowed to maintain indemnity actions back against contractors who had been injured. The rationale of these and other decisions has been that the party seeking indemnity, as, for example, a building owner or prime contractor, was shown to have been passively at fault in comparison to the active fault of the injured contractor. Sachs urges that this result obtain in this case and that it be granted indemnity against

the plaintiff.

In *Brown*, the court explained that a cause of action could be stated against the plaintiff because, as a contractor, he was in charge of the work and could be found liable under the Act. By way of contrast, the plaintiff in *Palier v. Dreis & Krump Manufacturing Co.* (1967), 81 Ill. App. 2d 1, 225 N.E.2d 67, was not an independent contractor, but was instead an employee of the third-party defendant. As an employee, the plaintiff was "a protected person within the meaning of that Act, totally incapable of a violation thereof whether actively or passively" (*Palier v. Dreis & Krump Manufacturing Co.* (1967), 81 Ill. App. 2d 1, 9, 225 N.E.2d 67, 70), and therefore not subject to indemnity under the Act.

Sachs' position is that this case should be governed by the result reached in *Brown* and *Volkman* because section 9 of the Structural Work Act allows any "owner, contractor, sub-contractor, foreman or other person in charge of" structural work to be held liable under the Act. (Ill. Rev. Stat. 1981, ch. 48, par. 69.) Like the plaintiff in *Brown* and the plaintiff's decedent in *Volkman*, the plaintiff here belonged to a category of potential defendants specifically listed in the Act, namely, foremen, and was not, unlike the mere employee in *Palier*, exempted from liability under the Act. It concludes that the plain language of the Act permits its indemnity or contribution claim against the plaintiff.

We reject Sachs' argument. In *Flora v. Home Federal Savings & Loan Association* (N.D. Ill. 1980), 489 F. Supp. 776, the district court denied an injured contractor's motion to strike the defendant's counterclaim for indemnification against him in a diversity action brought under the Structural Work Act. The United States Court of Appeals for the Seventh Circuit upheld the action taken by the district court and, in so doing, it examined the *Brown* and *Volkman* decisions. The court stated that those cases do not "remove the protection of the Act from one who is injured while working for a *separate legal entity* that is eventually found to be responsible for the injury. In such a case, the injured party is not personally in charge of the work and not personally liable. Rather, the responsible party is the separate legal entity, whether that entity be another individual, a corporation, or even a partnership to which the injured person is party." (*Flora v. Home Federal Savings & Loan Association* (7th Cir. 1982), 685 F.2d 209, 211.) Here, the plaintiff, although a foreman, was employed by Sachs, a separate legal entity, and was, according to the principles expressed in *Flora*, not subject to liability under the Act. Any claim for indemnity or contribution by Sachs against him there-

fore cannot stand.

CONCLUSION

That portion of the judgment of the circuit court of St. Clair County granting judgment to the plaintiff against UE for $219,000 is affirmed. That portion of the judgment denying UE indemnity against Sachs is reversed and judgment is hereby entered in favor of UE on its third-party complaint for indemnification from Sachs. Judgment is also entered in favor of the plaintiff and against Sachs on Sachs' counterclaim against the plaintiff.

Affirmed in part, reversed in part.

KARNS and HARRISON, JJ., concur.