ROBERT MATHIEU, Plaintiff-Appellee, v. VENTURE STORES, INC., Defendant and Third-Party Plaintiff-Appellee and Appellant (W. E. O'Neil Construction Company, Defendant and Third-Party Plaintiff-Appellee and Appellant; Hastings & Chivetta, Defendant and Third-Party Plaintiff; Hufschmidt Engineering Company, Third-Party Defendant-Appellee; North American Masonry and Precast Erectors, Inc., Third-Party Defendant-Appellant).

First District (5th Division)   No. 84—2783

Opinion filed June 6, 1986.

Law Offices of William E. Phillips, of Chicago (Michael F. Healy, of counsel), for appellant.

Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago (Curt N. Rodin, Nat P. Ozmon, and Dario A. Garibaldi, of counsel), for appellee Robert Mathieu.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Algimantas Kezelis and Russell P. Veldenz, of counsel), for appellee Venture Stores, Inc.

Crooks & Gilligan, Ltd., of Chicago (John W. Gilligan and David C. Burtker, of counsel), for appellee W. E. O'Neil Construction Company.

Slovacek & Slovacek P.C., of Crystal Lake, for appellee Hufschmidt Engineering Company.

JUSTICE LORENZ delivered the opinion of the court:

This appeal arises out of plaintiff Robert Mathieu's suit under the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*) for injuries he sustained while working on the construction of a Venture store in Norridge on May 17, 1977. Plaintiff sued Venture Stores, Incorporated (the owner), W. E. O'Neil Construction Company (the general contractor), and Hastings & Chivetta (the architects). Venture and O'Neil filed cross-claims against each other for indemnification. Both defendants also filed third-party complaints seeking indemnification from subcontractors North American Masonry and Precast Erectors, Incorporated, and Hufschmidt Engineering Company.

The jury found for Hastings & Chivetta on plaintiff's claim, and it is not a party to this appeal. However, the jury found for plaintiff as against Venture and O'Neil, awarding $450,000. The trial court directed verdicts for O'Neil on Venture's indemnity claim and for Venture on O'Neil's indemnity claim. The court also directed verdicts for Hufschmidt and North American on O'Neil's third-party indemnity claims. In bifurcated deliberations the jury then found for Hufschmidt but against North American on Venture's third-party indemnity claims.

On appeal, Venture contends: (1) the evidence did not establish its liability to the plaintiff; (2) the court erred in directing a verdict for O'Neil on Venture's counterclaim for indemnity; (3) the jury verdict for Hufschmidt on Venture's third-party indemnity claims was contrary to the manifest weight of the evidence; (4) Venture was prejudiced by evidence that Hufschmidt was out-of-business; (5) the court erred in not excusing for cause a juror when that juror learned that he was a defendant in a civil suit; (6) it was error to allow the jury to take notes during opening argument; (7) certain evidentiary errors by the trial court prejudiced Venture; (8) a jury verdict instruction was improperly phrased. North American contends: (9) the court should have granted its motion for a directed verdict on Venture's third-party indemnity claim. O'Neil contends: (10) the court erred in striking the defense of comparative fault from O'Neil's answer; (11) the court erred in directing verdicts for Venture, North American, and Hufschmidt on O'Neil's indemnity claims; (12) the jury award was excessive. Finally, Venture, North American and O'Neil all contend: (13) that the court erred in severing, for separate jury consideration, the third-party indemnity claims.

We affirm.

The plaintiff, a North American employee, was injured while attempting to install a 3,000-pound precast concrete panel. A crane at-

tached to the panel was disconnected because the prior installation of a canopy prevented using the crane in the final stages of the panel's installation. A second device not used to temporarily secure the panel was a pole brace and deadman (a cylindrical 3- to 4-foot hole filled with concrete used to anchor the pole brace attached to the panel). Instead a C-clamp was used to secure the panel. As plaintiff was working on a ladder against the panel, the panel began to fall over, forcing him to jump from the ladder.

John Strong, a graduate engineer, was, in May 1977, vice-president of engineering and construction for Venture. He was also the director of Venture's design and construction department, with a staff that included a construction superintendent, Carl Teare. They solicited proposals from three architectural firms and selected Hastings & Chivetta. A general construction contract was then entered into between Venture and W. E. O'Neil Construction Company.

The O'Neil contract required O'Neil to submit to Venture a construction schedule. This would show starting and completion dates for various stages of construction, including installation of precast concrete and structural steel. Venture had the power to suggest schedule revisions, although it often would accede to the opinion of O'Neil, which had the responsibility for compliance. Venture also had the right, with just grounds, to disapprove the scheduling. Approval of the schedule would have been by Carl Teare or Strong, or both of them. Although Strong could not specifically recall if he approved the schedule submitted by O'Neil, he assumed that it was approved.

According to Strong the decision to include the four precast concrete panels by the main entryway was that of Venture's and the architect's. He could not recall whether he knew in 1977 that the precast concrete panels were to be installed after the canopy. However he conceded that this quite possibly would have been included in O'Neil's master schedule. He also testified that he could have determined the method of installing these panels by looking at the architects' plans. Strong also testified that Venture could have required O'Neil to install the precast concrete panels before the canopy was on. Strong, who was at the job site an average of once a week during the foundation phase and once a month thereafter, stated that he may have been present when the precast concrete panels were being positioned.

Strong also testified that under the O'Neil contract Venture retained the right to review and reject O'Neil's subcontractors or even to hire subcontractors and assign them to O'Neil. O'Neil was required to comply with all Federal, State, and local safety rules. Venture re-

tained the right to terminate O'Neil if it disregarded rules or failed to properly supervise the work. The contract also gave Venture the right to terminate O'Neil for failure to comply with the sequencing schedule.

According to Strong the duties of Venture's construction superintendent, Carl Teare, were supervising compliance with the budget, schedule, and quality levels. In a deposition he had testified more broadly that Teare was to supervise the construction of the building. Strong also conceded that Teare's quality-compliance monitoring duties would include safety. Teare was to bring unsafe practices to the attention of the general contractor, O'Neil, and also could stop any unsafe actions. Teare also conducted job meetings with O'Neil's representative to discuss scheduling problems. On occasion Strong attended these meetings. Both Strong and Teare, as agents of Venture, "most probably" had the authority to stop any unsafe work.

Anthony Chivetta, a partner in the architectural firm of Hastings & Chivetta, testified that Venture had requested that they include the precast concrete slabs in their plans.

Thomas Blazek, general manager of Hufschmidt Engineering in 1977, testified that his firm was the supplier of the precast concrete panels. Before Venture hired its general contractor, O'Neil, Hufschmidt had already begun production of the panels, pursuant to an oral agreement with Carl Teare of Venture. Carl Teare also requested that Hufschmidt select North American as subcontractor for erection of the panels, and Blazek agreed to this.

Subsequently, the actual contracts between O'Neil and Venture, O'Neil and Hufschmidt, and Hufschmidt and North American were executed. The O'Neil-Hufschmidt contract specified that Hufschmidt was to supply the materials and labor to erect the panels, although provision was also made for subletting part of the work with O'Neil's permission. Under the terms of the contract, Hufschmidt also agreed to be solely responsible for compliance with all safety rules. Similarly, the Hufschmidt-North American contract required North American to take all necessary action to ensure compliance with safety and health requirements. According to William Karl, North American's founder, this latter contract was executed after the job had been completed.

William O'Neil, president of O'Neil Construction Company, testified that as general contractor his company coordinated the work of the subcontractors on the job site, including scheduling. Involved in the project for O'Neil Construction were Joseph Bertino, Jim Craig (vice-president of operations), Rich Rogers (project manager), and Jerry Belinski (job-site superintendent).

The job-site superintendent monitored scheduling and compliance with plans, specifications, and all safety rules. He had the right to stop the work until safety violations were cleared up. Specifically, Belinski's job included ascertaining that supports and ladders were placed and used safely and properly.

According to William O'Neil the safest method of securing a precast concrete panel during erection and until final connection would be by keeping it attached to a crane. A deadman and pole brace would be a safe alternative if the deadman were properly installed. The use of the C-clamp as occurred in this case was not safe. If O'Neil's superintendent, Belinski, observed this latter method he should have brought it to the attention of the workers.

North American's foreman on the day of the accident, Gary Maze, testified that the larger precast concrete panels were lifted off a truck by crane and remained attached to the crane until being welded in place to the structural steel beam. But this procedure could not be followed with the four smaller panels to be placed under the canopy because of the structural steel contained in the canopy. Three or four days before the accident Maze had discussed potential problems arising from this with William Karl (of North American) and Jerry Belinski (of O'Neil). Belinski told him that the canopy was up because the ironworkers had already been there and they wanted it up then. When Maze asked why no deadman was there Belinski said he had no time for four little panels. He instructed Maze to "muscle" the panel in and use a clamp. The plaintiff was injured while they were installing the first of the four panels. The procedure used was to maneuver the panel as close as possible to its setting with the crane, then disconnect the crane, push the panel in, and clamp it to the channel directly above it. Plaintiff and another worker held the panel in place with their hands while attempting to put on the C-clamp. They had difficulty putting it on, difficulty which O'Neil's supervisor, Belinski, observed before walking away. William Karl of North American was also present at this time. The panel fell over while plaintiff was on a ladder against it, causing him to jump and sustain injuries.

Maze testified that the only thing holding the panel in place was the C-clamp, which he did not consider a safe securing method. The deadman and pole brace could have been used to support the panel, but Belinski chose the C-clamp method. Maze also testified that based upon his experience in the industry it was the general contractor (O'Neil) that would install the deadman.

William Karl, founder of North American, also testified that the deadman would have been furnished by the general contractor. The

safest method of installation would have been to keep the crane attached to the panel the entire time. This could not be done because of the overhead obstructions. The next safest way would have been to use the deadman device. This could not be done because no deadman had been installed. Therefore the C-clamp method was the remaining alternative.

Dennis Puchalski, a construction safety expert called by the plaintiff, testified in response to a hypothetical question underlying the facts of this case. In his opinion the panel was not supported in a safe or suitable manner. The use of a C-clamp to secure the panel did not comply with the standards of the American National Standard Institute (ANSI). The most accepted practice would have been to hold the panel up with the crane while being welded. If a crane could not be used then a deadman's pole brace should have been used. Thus the ladder upon which the plaintiff was standing had also not been placed in a safe or suitable manner.

The plaintiff, who was born in 1932, testified that he had been a bricklayer since 1955. When he jumped off the ladder he suffered an injury to his right heel (established by medical testimony to be a shattered heel bone). As the result of the injury he had lost mobility in his right foot. If he stepped on a rock causing his foot to bend, he would fall down from the pain. Climbing stairs during the day would make him unable to walk at night. In the morning he has to loosen up the foot so he could walk. Working also aggravates the pain, although he had been working full time again since April 1978. Lloyd Coffman, a construction superintendent, testified that he had first worked with the plaintiff in 1957 and knew him to be one of the best in the trade. However, when the plaintiff worked for him five years after the accident in 1982 he was in extreme pain and was limited in the work he could do. He had to be accommodated by working only on level surfaces.

Medical testimony at trial established that the plaintiff's heel bone had been shattered and partially crushed. Damage to the padding beneath the bone made it much more uncomfortable to stand or walk. The plaintiff also developed degenerative arthritis. Surgery, amounting to a "fusion of the foot" would eliminate some of the pain but also would eliminate remaining side-to-side motion of the foot. The damage to the heel padding was permanent.

Up to the date of trial the plaintiff had lost wages of $24,900 and sustained medical expenses of $1,140. The fusion operation would cost $8,000 to $12,000.

1

We first consider Venture's contention that the evidence did not establish its liability to the plaintiff under the Structural Work Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*). To establish such liability the plaintiff was required to prove: (1) that Venture was "in charge of" the work, (2) that Venture wilfully failed to comply with the Act's requirements that it provide a safe support for the plaintiff to work on or under; and (3) that this failure was a proximate cause of the plaintiff's injuries. Ill. Rev. Stat. 1985, ch. 48, pars. 60, 69.

■ The issue of who is in charge of the work is generally a fact question within the province of the jury. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) Among the factors probative of having charge are the right to stop work, familiarity with construction methods and the cause of the injury, supervision or control of the work or retention of the right to do so, participation in activities at the work site, responsibility for employee safety, and inspections at the job site. *Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 415 N.E.2d 599.

■ Venture correctly notes that the mere fact of ownership does not establish it to be in charge of the work. (*Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 415 N.E.2d 599.) But the evidence in this cause clearly establishes that Venture's involvement was more than that of a mere owner. Venture maintained its own design and construction department headed by a graduate engineer, John Strong. Venture employed a construction superintendent, Carl Teare, who acted as Venture's safety supervisor on this project. Teare had the responsibility of pointing out unsafe practices to O'Neil and also stopping such practices. Venture required O'Neil to submit a construction schedule for Venture's approval and Venture retained the right to terminate O'Neil for failure to comply with this schedule. Clearly, this evidence establishes ample support for the jury's determination that Venture was one of those in charge of the work.

■ The evidence also establishes that the safety requirements of the Act were not complied with. Plaintiff's construction safety expert testified that the ladder on which plaintiff worked was not used in a safe or suitable manner. The precast concrete panel should have been secured by using a deadman's pole brace. He stated that use of the C-clamp to secure the panel did not comply with ANSI standards. O'Neil's president also conceded that the procedure used was unsafe and should have been brought to the attention of the workers by O'Neil's superintendent if (as the evidence indicated) he was aware of the procedure used. The evidence also established that the best

method of securing the panel, keeping it attached to the crane, could not be utilized because under the construction scheduling the structural steel of the canopy which blocked the crane was put into place before the panels were mounted.

Venture contends that improper scheduling of the work could not be considered to be a violation of the safety requirements of the Act. The Act is to be liberally construed so as to effectuate its purpose of affording broad protection to workmen. (*Grant v. Zale Construction Co.* (1982), 109 Ill. App. 3d 545, 440 N.E.2d 1043.) Thus, although the Act does not specifically refer to improper construction sequencing as a basis for a violation, we find that it was intended to apply to cases where unsafe supports resulted from such sequencing. See *Bishop v. Crowther* (1980), 92 Ill. App. 3d 1, 415 N.E.2d 599 (in which a ladder was improperly positioned in part because the prior installation of new gutters prevented safer positioning); *Alfano v. Board of Trade* (1979), 76 Ill. App. 3d 248, 395 N.E.2d 384 (in which a complaint was held to state a cause of action under the Act by alleging, *inter alia*, that a safe scaffold could not be erected because of obstruction by a drywall partition constructed first).

We find no merit to Venture's contention that any violation of the Act was not wilful. A wilful violation of the Act occurs when one of those in charge of the work knew of the existence of a dangerous condition or by the exercise of reasonable care could have discovered the existence of that condition. (*Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28, *affirmed* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.) Within these parameters all those deemed to be in charge of the work have a duty of compliance with the Act. (*Oldham v. Kubinski* (1962), 37 Ill. App. 2d 65, 185 N.E.2d 270.) In this cause Venture, which required O'Neil to submit a construction schedule for its review and approval, and which employed its own construction superintendent to supervise safety compliance at the work site, knew or should reasonably have discovered the dangerous conditions at issue here.

Finally, on this issue we find no basis for overturning the jury's determination that the unsafe conditions we have discussed were the proximate cause of plaintiff's injuries. Plaintiff was injured because the improperly secured panel upon which his ladder was resting fell over. The manner in which the work was scheduled barred the safest method of securing the panel, keeping it attached to the crane. Another appropriate method, using the deadman and pole brace, was rejected because a deadman had not been installed on the site. Expert testimony at the trial indicated that the method used, a C-clamp, was

unsafe. Accordingly, we find that the jury properly found Venture liable to plaintiff under the Act.

### 2

■■ ■ We find no error in the directed verdict entered by the court for O'Neil on Venture's counterclaim for indemnity. (Venture also erroneously contends that the court directed a verdict for O'Neil on O'Neil's counterclaim against Venture.) Because there can be degrees of fault among those who are accountable under the Act to an injured plaintiff, the less culpable party may seek indemnification from the more active party. (*Miller v. DeWitt* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.) The relative faults of each party must be weighed and the conduct of the indemnitor must be found to be primary, or active, while that of the indemnitee must be secondary, or passive. (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628.) In this cause both Venture and O'Neil were involved in the construction scheduling which we have found to have been one of the causes of plaintiff's injuries. Venture required O'Neil to prepare the schedule and to submit it to Venture for review and approval. When the conduct of these two parties is compared with respect to this particular violation of the Act (improper construction scheduling) we do not find such a qualitative difference as to permit Venture to obtain indemnification.

### 3

■■ Venture also contends that the jury verdict for Hufschmidt on Venture's third-party indemnity claim was contrary to the manifest weight of the evidence. But the evidence clearly establishes that Hufschmidt was in fact merely the supplier of the precast concrete panels. Even assuming that Hufschmidt's contractual undertaking, which the evidence establishes was subcontracted to North American at Venture's request, imposed upon Hufschmidt an obligation to supervise the work, Hufschmidt's failure to discover safety violations would only constitute passive negligence and would not support Venture's indemnification claim. *Lindner v. Kelso Burnett Electric Co.* (1971), 133 Ill. App. 2d 305, 273 N.E.2d 196.

### 4

■■ We also find no merit to Venture's claim that it was prejudiced when witness Thomas Blazek of Hufschmidt revealed, in non-responsive answers to questioning by counsel for North American and O'Neil, that Hufschmidt was out-of-business. No objection was made

to the first response and no substantial prejudice could have arisen from these comments given our determination as to the merits of Venture's claim against Hufschmidt.

### 5

■■■ Venture next contends that the court erred in not excusing a juror for cause. After the jury had been sworn but before opening arguments one juror informed the court that after being sworn he had been served with a summons as a defendant in a civil suit arising out of an automobile accident. In response to court questioning, the juror stated that he did not believe this would influence his deliberations. The court then permitted the juror to remain on the jury over the objection of counsel for Venture, who conceded that he did not know which party might be prejudiced. On appeal Venture contends the court was required to dismiss this juror because being a party to a pending suit is a statutory basis for a challenge for cause. (Ill. Rev. Stat. 1985, ch. 78, par. 14.) But Venture has not suggested any manner in which it was prejudiced by the court's decision. In the absence of any showing of prejudice, we decline to reach the issue of whether the court was required to excuse this juror for cause after the jury had been sworn. *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628.

### 6

■■■ Venture contends that the court erred in allowing the jury to take notes during opening argument. This contention is frivolous. Jurors have a statutory right to take notes, with no distinction made between opening arguments and testimony. (Ill. Rev. Stat. 1985, ch. 78, par. 36(b).) Furthermore, nothing in the record establishes that any notes were taken by jurors during opening argument.

### 7

■■■ We next consider Venture's contentions that the trial court committed several errors concerning the admissibility of evidence. In questioning plaintiff about difficulties he encountered in attempting to secure the panel with a C-clamp, plaintiff's counsel asked plaintiff what "concern" placing the clamp on an angle caused him. Venture objected to this on the ground that plaintiff's state of mind was irrelevant. That objection was overruled, and plaintiff went on to testify that the clamp was not designed to be used on an angle. Clearly this testimony was relevant to the issue of the safety of using a C-clamp in these conditions, and the court did not err in allowing this testimony.

■■ Without any citation to a specific page in the transcript, Venture contends that the court erroneously permitted William O'Neil to testify that Venture's supervisor, Carl Teare, had coordinated work on prior Venture construction projects. In his answering brief plaintiff has noted that he could find no instance in which such testimony was actually elicited. Venture has failed to respond to this contention in its reply brief, and we deem the matter to have been abandoned.

■■ Venture contends that it was error for the court to permit plaintiff's counsel to elicit from an examining physician a statement of symptoms made by plaintiff in the course of the doctor's examination. Without regard to whether such statements would be admissible under *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, as a basis for the doctor's opinion, the fact that plaintiff himself testified concerning his symptoms satisfied any possible hearsay objection (*Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628).

Although Venture also contends that the court erred in permitting safety expert Dennis Puchalski to testify as to who supplies a deadman on a construction site, that witness in fact never gave such testimony.

## 8

■■ On the issue of damages the court instructed the jury:

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him *for the nature, extent and duration of the following elements* of damage proved by the evidence to have resulted from a violation of the Structural Work Act by the defendant or defendants:

The disability resulting from the injury.

The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries.

The reasonable expense of necessary medical care, treatment, and services received and the present cash value of the reasonable expenses of medical care, treatment and service reasonably certain to be received in the future.

The value of earnings and benefits lost and the present cash value of the earnings and benefits reasonably certain to be lost in the future.

Whether any of these elements of damages has been proved by the evidence is for you to determine." (Emphasis added.)

Venture contends that under the holding of *Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152, it was improper to refer to the "nature, duration and extent" of an injury. But *Powers* held only that an instruction listing this factor as a *separate element* of damage was improperly duplicative because that factor was necessarily a part of the other elements. The instruction fashioned in this cause clearly was not duplicative and was proper under *Powers.*

### 9

North American contends that the trial court erred in denying its motion for a directed verdict on Venture's third-party indemnification claim. North American asserts that because, in ruling on the cross-claim of O'Neil and Venture the court found Venture to have been actively negligent, Venture could not recover from North American. But the court subsequently indicated that it was only comparing Venture's behavior to that of O'Neil. As we have noted both those parties were involved in scheduling of the work and also had supervisory responsibilities concerning the construction. Thus the court properly determined that no qualitative distinction could be made in their conduct such as would permit indemnification.

The evidence as to North American established that it was the actual erector of the improperly secured panel. As the plaintiff's employer North American was directly responsible for the particular work which directly produced the injury. It supplied the C-clamp and placed the ladder on which plaintiff worked. On the other hand in oral argument before this court North American has conceded that its claim of active conduct by Venture is based solely on Venture's involvement in the scheduling of the work which prevented use of the safest method of securing the panel.

■■ The underlying premise for implied indemnification is that between the parties of a particular case fairness and equity require shifting total liability to the indemnitor. (*Przybylski v. Perkins & Will Architects, Inc.* (1981), 95 Ill. App. 3d 620, 420 N.E.2d 524.) We find, in comparing the actions of North American and Venture, that the trial court correctly permitted the jury to determine this indemnification question in Venture's favor.

### 10

■■ We find no merit to O'Neil's contention that the trial court erred in striking the defense of comparative fault from its answer. As O'Neil concedes, that issue has been determined adversely to O'Neil by the Illinois Supreme Court in *Simmons v. Union Electric Co.*

(1984), 104 Ill. 2d 444, 473 N.E.2d 946.

11

■ We also find no basis for overturning the trial court's directed verdict for Venture, Hufschmidt, and North American on O'Neil's indemnity claims. Clearly the conduct of O'Neil's supervisor in ordering North American to proceed without a deadman and pole brace, and in simply leaving the scene upon observing the difficulties in underlying a C-clamp, constituted active negligence such as to preclude O'Neil from seeking indemnification. *Lindner v. Kelso Burnett Electric Co.* (1971), 133 Ill. App. 2d 305, 273 N.E.2d 196.

12

■ With respect to O'Neil's claim that the $450,000 jury award was excessive, we would note that the amount of damage is generally a question of fact for the jury. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63, *cert. denied* (1959), 361 U.S. 127, 4 L. Ed. 2d 180, 80 S. Ct. 256.) Among the factors to be considered are the permanency and extent of injury, possible future deterioration, medical expenses, and restrictions on daily activity because of the injury. *Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28, *affirmed* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.

This plaintiff had already sustained medical expenses and lost wages totalling over $26,000. Testimony established the likelihood that another operation would be required at a cost of up to $13,000. The plaintiff testified to the restricted mobility and pain he continued to experience at the time of trial. He was restricted in the manner in which he could perform his work. Medical testimony established that he had developed degenerative arthritis and that the damage to his heel padding was permanent. Based on this evidence we cannot say that the jury's verdict was obviously the result of passion or prejudice, and consequently we will not disturb it on review. *Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28, *affirmed* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.

■ Finally, as we have noted, Venture, North American, and O'Neil all contend that the trial court erred when, on the day closing arguments were to begin, it granted plaintiff's motion to sever the third-party actions from plaintiff's action. The jury heard the closing arguments of plaintiff and the three defendants and then determined liability on plaintiff's claim. Thereafter the jury heard arguments on the third-party claims of Venture against Hufschmidt and North American.

As plaintiff notes, the record establishes that North American had not yet completed its jury instructions at the time closing arguments were to commence. The court, in the exercise of the broad discretion it is granted in conducting a trial (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188), determined that severance would clarify the issue for the jury. We find that the procedure did simplify the jury's considerations and find no abuse of discretion by the trial court.

For the reasons set forth in this opinion, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P.J., and PINCHAM, J ., concur.